## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHNNIE WEBB, JR., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No.: 1:21-cv-424 |
| | ) | |
| DAYMARK RECOVERY SERVICES, INC.; and FREEDOM HOUSE RECOVERY CENTER, INC. | ) ) ) | **COMPLAINT** |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

COMES NOW, Johnnie Webb, Jr. ("Plaintiff"), by and through undersigned counsel, complaining of the above-named Defendants, alleges and avers as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff is a former employee of Defendants.

2.      This action is brought for unpaid overtime compensation, liquidated damages, and all related penalties and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  Plaintiff was an employee of Defendants for approximately twenty (20) years.  During his employment, Plaintiff worked for Defendants as both a Health Care Counselor and Mobile Crisis Clinician but was not properly compensated for all of his hours worked, through the date of his wrongful termination, May 26, 2020.  During Plaintiff's employment, Defendants willfully failed and refused to compensate Plaintiff all wages, including for all hours worked, and modified records in order to avoid compensating Plaintiff for all hours worked in excess of forty (40) in a week

at a rate of time and one-half his regular rate, due and owing to Plaintiff, in direct violation of the FLSA, 29 U.S.C. § 201 *et seq*.

3.  Plaintiff also brings this action against Defendants for failing to pay Plaintiff all earned and accrued wages, including, but not limited to, promised straight-time compensation, the promised premium compensation for hours in excess of forty (40) per week, and unpaid and unused vacation and sick pay, on his regular pay date, in direct contravention of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq*.

4.  Defendants' pay practices and policies were in direct violation of the FLSA and the NCWHA. Accordingly, Plaintiff seeks any unpaid straight-time compensation, unpaid overtime compensation, unpaid owed, earned, accrued, and promised wages, in addition to liquidated damages, attorneys' fees and costs, interest, and other damages permitted by applicable law.

5.  This action is also brought by Plaintiff to remedy Defendants' unlawful acts under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, upon Plaintiff's need to exercise his rights under the FMLA, in addition to claims arising under the North Carolina Retaliatory Employment Discrimination Act ("REDA'), N.C. Gen. Stat. § 95-240, for discriminating against Plaintiff following complaints regarding not receiving all of his earned, accrued, and promised wages and Defendants subsequently terminating Plaintiff as a direct result of these complaints and inquiries, as Defendants failed to comply with its obligations under the FMLA and ultimately terminated Plaintiff in violation of the FMLA, REDA, and North Carolina public policy.

2

6.     Accordingly, Plaintiff seeks all available relief for these claims, including, but not limited to, back pay, front pay, liquidated and/or treble damages, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorney's fees and costs, and all other relief permitted by applicable law.

## JURISDICTION AND VENUE

7.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 for the claims brought under the FLSA, 29 U.S.C. § 201, *et seq.* and FMLA, 29 U.S.C. § 2601, *et seq.*

8.     The United States District Court for the Middle District of North Carolina has personal jurisdiction because Defendants conduct business throughout North Carolina, including, but not limited to, in the following counties: Cabarrus, Chatham, Davidson, Davie, Durham, Montgomery, Moore, Orange, Person, Richmond, Rockingham, Rowan, Stokes, and Surry. The counties are located within this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 1391(c), inasmuch as at all relevant times, Defendants conducted business within the Middle District of North Carolina, and part of the events or omissions giving rise to these claims occurred in this District.

10.     The claims for violations of the NCWHA and REDA are based upon the statutory law of the State of North Carolina.

11.     Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for the pendent state claims because they arise out of the same nucleus of operative facts as the FLSA and FMLA claims.

3

12.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

13.     The evidence establishing liability for both causes of action will be similar, and neither issue will predominate nor create confusion for a jury.

## PARTIES

14.     Plaintiff is an adult resident of the State of Maryland. During the relevant time period, Defendant was a reside of the state of North Carolina, residing in Durham County, North Carolina.  He worked for Defendants as an hourly-paid, nonexempt employee from approximately 1999 until his wrongful termination on May 26, 2020.

15.     Defendant Freedom House Recovery Center, Inc. ("Defendant Freedom House") is a not-for-profit behavioral healthcare provider in the state of North Carolina, with its principal place of business located at 104 New Stateside Drive, Chapel Hill, NC 27516. Defendant Freedom House has been an employer of Plaintiff, and is thus liable as an employer, joint employer, single enterprise and/or otherwise according to statutory law.

16.     In 2019, Defendant Freedom House reported a revenue of over $8,000,000.00. Upon information and belief, Defendant Freedom House employs over 200 employees.

17.     Defendant Daymark Recovery Services, Inc. ("Defendant Daymark") is a not-for-profit behavioral healthcare provider in the state of North Carolina, with its principal place of business located at 284 Executive Park Dr. NE, Concord, North Carolina 28025.  Since Defendant Daymark merged with Defendant Freedom House in July 2018, Defendant Daymark has been an employer of Plaintiff, and is thus liable as an employer,

joint employer, single enterprise and/or otherwise according to statutory law.

18.     In 2019, Defendant Daymark reported a revenue of over $60,000,000.00. Upon information and belief, Defendant Daymark employs over 950 employees.

19.     At all relevant times, Defendants acted as joint employers with respect to providing restoration services, as defined in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017) and as set forth below at ¶¶ 28-44.

20.     During the period relevant to this action, each Defendant was an employer, joint employer, or member of an integrated, common enterprise, that employed Plaintiff, pursuant to the NCWHA, FLSA, REDA, and FMLA, in that each Defendant, or its agents, held or implemented the power, *inter alia*, to control the work performance of Plaintiff, and each Defendant directly received the benefit of Plaintiff's labor.  More information about the nature and role of each Defendant within the enterprise is provided in greater detail below.

## COVERAGE

21.     At all times material to this action, Defendants have acted, directly or indirectly, in the interest of an employer with respect to Plaintiff.

22.     At all times material to this action, Defendants were employers within the defined scope of the FLSA, 29 U.S.C. § 203(d).

23.     At all times material to this action, Plaintiff was an employee within the scope of the FLSA, 29 U.S.C. §§ 206 and 207.

24.     At all times material to this action, Defendants were an enterprise engaged in related activities performed through a unified operation or common control for a

5

common business purpose, as defined by the FLSA, 29 U.S.C. § 203(r).

25.     At all times material to this action, Defendants were joint employers pursuant to 29 C.F.R. § 791.2.

26.     At all times material to this action, Defendants were an enterprise engaged in commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce, care of the sick or mentally ill, or in the production of goods for commerce, or employees handling, selling, or otherwise working on services, goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

27.     At all times material to this action, Defendants have been, and continue to be, an "employer" engaged in "commerce or in any industry or activity affecting commerce," which employ fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, within the meaning of the FMLA, 29 U.S.C. § 2611(4).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Joint Employer and Common Enterprise Allegations[1]

28.     Defendants share the same mission: to promote, enhance, and support recovery for individuals with substance abuse, mental illness, and developmental disabilities.

---

[1] Only for purposes of ease of reference, Plaintiff separate relevant factual allegations into subheadings. However, details provided in one subsection further support part or all of Plaintiff's allegations, as asserted herein.

29.     Defendant Freedom House has provided detoxification and addiction recovery services and treatment to individuals from across the state of North Carolina since 1974.

30.     Similarly, Defendant Daymark is a behavioral healthcare provider for individuals from over 80 North Carolina counties.

31.     In July 2018, Defendant Freedom House merged with Defendant Daymark Recovery, in order to combine their resources and support staff and expand the geographic coverage of their shared health services.

32.     As part of this transition, Defendant Daymark assumed responsibility and control of the mobile crisis services provided by Defendant Freedom House.

33.     To provide these services to their mutual clients, Defendants share a mobile crisis hotline, wherein Defendants' employees will accept and coordinate calls from individuals calling in to receive the benefit of Defendants' shared services.

34.     Defendant Freedom House's website refers clients seeking assistance through the mobile crisis program to the same phone number listed on Defendant Daymark's website for the mobile crisis program. This hotline number is operated and maintained by Defendant Daymark.

35.     Effectively, individuals who are seeking treatment or assistance with a behavioral health issue first call the hotline number, which directs calls to Defendant Daymark's call centers. After speaking with the individual, an operator from Defendant Daymark's call center will then contact service providers, including Defendant Freedom House's mobile crisis clinicians, such as Plaintiff, to assess and assist with the individual's

7

treatment needs.

36.     Upon taking a call, Mobile Crisis Clinicians would speak with the caller and offer the various options for assistance provided by Defendant Freedom House: (1) performing a crisis assessment and/or taking the caller to the hospital for a psychological evaluation with a doctor; (2) taking the caller to a rehabilitation or medical-care facility for assistance; or (3) setting up an appointment with an out-patient facility and assisting the caller with coordinating therapy sessions. Depending on the assistance requested, Mobile Crisis Clinicians could be required to immediately meet with the caller in person.

37.     For each call, Mobile Crisis Clinicians were first required to submit details of the call in Defendant Daymark's database; then, if after answering the call, the Mobile Crisis Clinician drove to the caller and/or provided any services, the Mobile Crisis Clinician would then submit details of the services provided in Defendant Freedom House's system, which would then submit the services to billing for payment from the caller for services provided.

38.     Additionally, following the merger, Plaintiff was required to go through Defendant Daymark's interview process for various positions, including for a full-time mobile crisis clinician position.

39.     Managers for Defendant Daymark also supervise Defendant Freedom House employees, including jointly coordinating and setting Plaintiff's schedule and hourly rate and/or assisting with administrative issues during a call.

40.     To ensure consistent services and treatment of potential and existing clients, Plaintiff was required to attend training at Defendant Daymark's facility in Cabarrus

County. Following this training, Plaintiff was also required to attend monthly staff meetings led by Defendant Daymark's directors and supervisors.

41.     Following the merger, Plaintiff's primary points of contact were Defendant Daymark's supervisors.

42.     After July 2018, Plaintiff maintained an email address on the Defendant Freedom House server as well as received and maintained an email address on the Defendant Daymark server.

43.     Defendant Daymark's privacy notice to potential clients informs Defendants' shared clients that in order to perform business health care operations, Defendant Daymark will share the clients' health information in order "[t]o communicate with other Service Providers who have Business Contracts with DAYMARK Recovery Services. These include therapeutic foster families, residential group homes and *community based service providers*. When these services are contracted, we may disclose your health information to our business associates so that they can provide you services and bill you or your third-party payer for services rendered. To protect your health information, however, we require the business associate to appropriately safeguard your information."

44.     Ultimately, Defendants provide the same service, behavioral health care, to the same clients, and operate under a unified operation and system, serving the same business purposes.

## B.  Wage-Related Allegations

45.     Plaintiff first began his employment with Defendant Freedom House in 1992 as a full-time Health Care Counselor. In this position, Plaintiff was compensated on an

9

hourly basis and was primarily responsible for working with patients in the detox center on the weekend shift.

46.     In 1997, Plaintiff resigned from his position with Defendant Freedom House to explore other employment opportunities.

47.     In 1999, Plaintiff returned to work with Defendant Freedom House as a full-time Health Care Counselor. As a Health Care Counselor, Plaintiff was compensated on an hourly basis, with an hourly rate of approximately $16.00.

48.     On or about 2010, the then-director of Defendant Freedom House, Anita Daniels, offered Plaintiff the opportunity to work additional shifts on the weekend as a Mobile Crisis Clinician and Plaintiff accepted. The director explained this part-time position would require Plaintiff to work during the weekends, but that Plaintiff would receive a higher hourly rate of $18.00 per hour.

49.     While working as a full time Health Care Counselor and a part-time Mobile Crisis Clinician from 2010 until approximately January 2019, Plaintiff typically worked as a full-time counselor during the week and a part-time clinician on weekends.

50.     Following Defendants' merger, Plaintiff was extended the opportunity to apply for a full-time Mobile Crisis Clinician position, given his experience in the role as a part-time clinician and decades-long tenure with Defendant Freedom House. In January 2019, Plaintiff began working as a full-time Mobile Crisis Clinician.

51.     Upon being assigned to a full-time Mobile Crisis Clinician position, Ms. Kim Anthony-Byung, the Director of the Mobile Crisis Division for Defendant Daymark, explained to Plaintiff that he would receive the same hourly rate of $18.00 and would be

based on his time punches into Defendant Freedom House's timekeeping system, Prime Pay.

52.     As a Mobile Crisis Clinician, Plaintiff's responsibilities included, but were not limited to, responding to phone calls from individuals experiencing a crisis. All new calls Plaintiff received were directly transferred to Plaintiff by individuals working at Defendant Daymark's call centers, as described above. In between receiving new calls, Plaintiff was responsible for completing paperwork on a computer provided by Defendant Daymark or following-up with callers from previous shifts.

53.     While working as a full-time Mobile Crisis Clinician from January 2019 until his termination in May 2020, Plaintiff typically worked at least sixty (60) hours a week. Plaintiff was typically scheduled to work four (4) 15-hour shifts each week, from 5:00 p.m. to 8:00 a.m., Monday through Thursday. For each shift, Plaintiff clocked in and clocked out using Prime Pay, in order to document all hours worked.

54.     After submitting his weekly timesheet, Plaintiff's direct supervisor, Trish Burkett, who also works for Defendant Daymark, would approve Plaintiff's timesheet and submit the time records to Human Resources for payroll processing. To Plaintiff's knowledge, his timesheets, based on his time punches, were always approved each week.

55.     In addition to his regularly scheduled shifts, Plaintiff would regularly volunteer to work a weekend shift. Initially, Plaintiff would punch in and punch out using Prime Pay for the additional weekend shifts. However, after approximately eight (8) months of working additional weekend shifts, Plaintiff was instructed to not clock-in and clock-out on Prime Pay because it registered too many hours of overtime.

56.     Thereafter, if Plaintiff picked up an additional shift, he was required to submit his hours directly to Defendant Daymark, by writing down the additional weekend shifts worked and Daymark would confirm the shifts worked with Plaintiff's supervisor. Then, once a month, Defendant Daymark would pay Defendant Freedom House for the weekend/additional shifts worked by Plaintiff. Defendant Freedom House would then pay Plaintiff for his additional/weekend shifts with the funds provided by Defendant Daymark. In other words, Defendant Daymark tracked additional shifts and work performed by Plaintiff and then transferred the wages to Defendant Freedom House to pay once a month.

57.     For regularly scheduled shifts, though, Plaintiff was compensated biweekly.

58.     While Plaintiff accurately tracked his hours worked, Plaintiff noticed a clear discrepancy in the documented hours worked and the hours actually paid: the timesheets created based on punch-in and punch-out times (and that were submitted and always approved) were consistently greater than the hours documented and paid on Plaintiff's earning statements, which consistently indicated Plaintiff was only paid for up to 86.67 hours per two-week pay period, despite Plaintiff's time sheets showing he regularly worked at least 120 hours per two-week pay period.

59.     For example, from October 10, 2019, through October 25, 2019, Plaintiff's timesheets document Plaintiff worked a total of 143.19 hours. However, Plaintiff's earning statement for the same two-week time period documents Plaintiff only received compensation for 86.67 hours at his promised, regular hourly rate of $18.00. For this two-week period, Defendants failed to compensate Plaintiff for 56.52 hours of work.

60.     More precisely, from October 10, 2019 through October 16, 2019, Plaintiff

12

worked 60.04 hours (as documented in his timesheet) and should have received $1,261.08, yet only received $780.00. In other words, for work performed from October 10, 2019 through October 16, 2019, Defendants failed to compensate Plaintiff for at least 16.705 hours at the overtime rate of one-and-one-half times his hourly rate, or his promised premium rate of $27.00, and Plaintiff is owed at least $481.08 in unpaid wages for this one week alone.

61.     Additionally, while Plaintiff's timesheets typically documented Plaintiff's pay rate at $18.00 per hour, for some weeks, Plaintiff's timesheets document a pay rate of $0.00 per hour but an overtime rate of $27.00 per hour. Equally inconsistent, while Plaintiff's earning statements document Plaintiff's regular hourly rate of $18.00 per hour, without explanation, for some "regular" hours, Plaintiff received only $14.90 per hour.

62.     For example, Plaintiff's January 15, 2019, earning statement shows Plaintiff received a rate of $18.00 per hour for "regular" hours and also received $14.90 per hour for a separate category of "regular" hours. Moreover, despite this earning statement indicating Plaintiff received compensation for 83.46 hours worked over a two-week period (December 26, 2018 through January 8, 2019), Plaintiff did not receive any premium overtime compensation.

63.     Defendants failed to pay Plaintiff all earned and accrued wages, for all hours worked, including compensation at the promised regular hourly rate of $18.00 for hours up to forty (40) in a week and at the promised premium rate of $27.00 for hours worked in excess of forty (40) in a week.

64.     In addition to Plaintiff's hourly rate, Defendants maintained a practice of

13

providing Plaintiff paid vacation and sick leave. Each week, Plaintiff's accrued vacation and sick leave appeared on Plaintiff's timesheets, as tracked by Prime Pay.

65. As part of Defendant's vacation and sick leave policy, Defendants did not notify Plaintiff of any forfeiture of leave pay upon termination of employment.

66. Moreover, if Plaintiff needed to take a full or partial day off work, including as little as one hour, Plaintiff was required to use either vacation or sick leave to supplement the pay or else he would not receive compensation for the time missed.

67. As of May 25, 2020, Plaintiff had accrued 138 hours of vacation pay and 57.56 hours of sick pay.

68. Upon Plaintiff's wrongful termination, Defendants only compensated Plaintiff accrued vacation pay but did not compensate Plaintiff his then-accrued paid sick earnings.

## C. FMLA, Retaliation, and Wrong Termination Allegations

69. On or about July 2019, Plaintiff's son was run over by a vehicle and suffered severe injuries, including leaving Plaintiff's son comatose for weeks and potentially needing amputation.

70. As a result of Plaintiff's son's injuries, Plaintiff was required to seek leave from work and stay with his son in the Intensive Care Unit in Maryland, in order to be available and make medical decisions as needed and at a moment's notice.

71. Plaintiff notified his direct supervisor, Trish Burkett, and requested time off to assist with his son's medical treatment and help care for his son. Ms. Burkett, while sympathetic, told Plaintiff to take care of his son.

14

72. While Plaintiff was permitted to use his vacation and sick pay to cover his absences, Defendant did not provide Plaintiff any documentation on the FMLA or advise Plaintiff of his rights under the act.

73. After two weeks of Plaintiff's "leave" from work, Plaintiff's direct supervisor, Ms. Burkett called Plaintiff on a Friday and asked Plaintiff if he would be returning to work and advised Plaintiff that Defendants had scheduled him to work on Saturday. Plaintiff informed Ms. Burkett that his son was still not doing well and that Plaintiff's presence was still needed in order to make medical decisions on behalf of his son. Ms. Burkett reiterated that Plaintiff was scheduled to work and needed to return.

74. Not wanting to jeopardize his employment, Plaintiff agreed to return to work the next day. However, Plaintiff reiterated that while he could work the next week, he would need to return to Maryland to continue caring for his son in the ICU.

75. After working that week, Plaintiff then returned to be with his son for two more weeks.

76. Thereafter, Plaintiff returned to work full time, despite his son's continued medical treatment.

77. Despite Plaintiff having worked for Defendant Freedom House for over twenty years and working for both Defendants following the merger, Defendants never informed Plaintiff of his rights under the FMLA nor of the company's procedure for requesting family and medical leave. Furthermore, Defendants never indicated to Plaintiff that he may qualify for FMLA leave.

78. Moreover, both Defendants separately and jointly employ more than fifty

15

(50) employees.

79.     After several months of working as a full-time mobile crisis clinician, as described above, Plaintiff noticed the hours stated on his earning statements did not match the hours documented on Plaintiff's weekly timesheets, which accurately recorded Plaintiff's hours worked.

80.     On or about December 2019, Plaintiff spoke with Ivy Williams, the Human Resources Director at Defendant Freedom House and reported the discrepancies between Plaintiff's pay, the actual hours worked, and falsified hours on Plaintiff's earning statements. Ms. Williams simply responded that the earning statements were the correct documents and that if Plaintiff wanted copies of his earning statements, to speak with Ms. Lewanda Edwards, the Human Resources Assistant.

81.     However, when asked, Ms. Edwards only provided Plaintiff copies of the earning statements with the modified/falsified hours, rather than Plaintiff's timesheets that contained Plaintiff's actual punch-in and punch-out times. Plaintiff then showed Ms. Edwards, using his limited web access to Prime Pay, that the hours on the earning statements were significantly less than the hours Plaintiff submitted on Prime Pay. While Ms. Edwards acknowledged the earning statements did not match the timesheets, Ms. Edwards stated, "these hours were the ones we were given."

82.     After this meeting with Ms. Edwards, Plaintiff's supervisor, Ms. Burkett, began scrutinizing his work, questioning why Plaintiff was not entering callers' details into Defendant Freedom House's system, so that the company could bill the callers. However, Plaintiff knew this criticism was baseless, as the standard operating procedure had always

16

been to (1) first, enter the caller details into Defendant Daymark's database and (2) only enter the caller details into Defendant Freedom House's system *after* providing a service, and if Plaintiff entered the caller's details into Defendant Freedom House's system without providing a service first, this could qualify as a violation of patient confidentiality under HIPAA.

83.     Moreover, other Mobile Crisis Clinicians followed the same procedure and refused to enter non-consenting patient's information in Defendant Freedom House's system. Still, Plaintiff's supervisor continued to isolate Plaintiff and criticize his work.

84.     The increased scrutiny was a direct result of Plaintiff's raising alarms of the falsified hours on his earning statements that his supervisor, Ms. Burkett, was submitting to human resources, rather than an issue with Plaintiff's work.

85.     Following these initial conversations with Human Resources and the increased scrutiny of Plaintiff's work, it was evident Human Resources had no intentions of assisting Plaintiff with his complaints.

86.     The following month, in early January 2020, Plaintiff, still aware of the continued unlawful pay practices, attempted to print the accurate timesheets available on Prime Pay's system. However, Plaintiff had apparently been blocked from making physical copies of his timekeeping records.

87.     Plaintiff then approached Mr. Keith Haynie, the Drug Court Program Director, to report his concerns about Defendants' withholding his earned wages. Again, Plaintiff showed the discrepancy between the hours listed on his earning statements and the hours documented on his timesheets. Mr. Haynie recommended Plaintiff ask Human

17

Resources for the phone number to Prime Pay in order to directly obtain copies of Plaintiff's accurate timesheets.

88. After continued pay issues and after Plaintiff had alerted multiple individuals who work for Defendants, in May 2020, Plaintiff contacted Ms. Edwards to request Prime Pay's phone number.

89. Plaintiff attempted to contact Prime Pay but was never able to speak with a representative who would assist Plaintiff with his efforts to obtain copies of his timesheets.

90. Plaintiff again approached Ms. Edwards, asking that Human Resources correct his pay and ensure Plaintiff is compensated for all hours worked, as documented on his timesheets.

91. During this meeting, Plaintiff again pointed out to Ms. Edwards that the earning statements do not show the same hours worked as recorded by Plaintiff's time punches. Upon reviewing the various documents, Ms. Edwards agreed the hours on the earning statements were not accurate and promised to provide Plaintiff copies of the accurate timesheets (the timesheets based on actual punch-in and punch-out times and those submitted to Plaintiff's supervisor for approval).

92. The following week, on May 22, 2020, Plaintiff received an email from his supervisor, Ms. Burkett, stating: "We need to meet with you before your next scheduled shift."

93. Because the email was sent on Memorial Day Weekend, Plaintiff was not scheduled to work until 5:00 p.m. the following Tuesday, May 26, 2020. That day, less than one hour before Plaintiff was scheduled to begin his shift, Ms. Burkett and Ms.

Williams called Plaintiff and advised Plaintiff that Defendant Freedom House would no longer need Plaintiff's services.

94.    Defendants advised Plaintiff he was being terminated for placing clients in danger by refusing to enter caller information into Defendant Freedom House's system. Plaintiff responded that this was the first he had heard of putting a customer in danger, denied doing so, and reiterated that Plaintiff documented all callers' information in Defendant Daymark's database and then, if the caller received services, documented the callers' information in Defendant Freedom House's database. Plaintiff also reiterated that entering non-client medical information into Defendants' databases would have resulted in violations of HIPAA confidentiality provisions.

95.    Subsequently, Defendants asserted Plaintiff was terminated for failing to complete meetings with his supervisors, including during the summer of 2019 when Plaintiff was required to split his time between taking time off to care for his son's life-threatening injuries and working for Defendants.

96.    Following his termination, Plaintiff again contacted Ms. Edwards in Human Resources to obtain copies of his actual timesheets. During this conversation, Ms. Edwards explained Defendants had been switching Plaintiff to a salaried-exempt employee, without notice, and basing Plaintiff's compensation on the falsified records, when in fact, Plaintiff was an hourly employee. Ms. Edwards confirmed the company had been "shorting" Plaintiff out of pay.

97.    Despite Plaintiff's more than twenty-years of work for Defendants and Plaintiff's willingness to continue work, pursuant to Defendants' promised hourly rates,

19

Defendants terminated Plaintiff.

98.     Since May 27, 2020, Plaintiff has not been able to find comparable employment, despite his best efforts. In fact, Plaintiff has applied for over at least thirty (30) similar jobs, based on the same duties, responsibilities, and experience, but Plaintiff has only received five (5) callbacks and no job offers. Upon information and belief, Defendants continue to retaliate against Plaintiff by obstructing his ability to obtain new employment.

99.     As a result of Plaintiff's continued unemployment, Plaintiff was forced to sell his home of more than fifteen (15) years and relocate to his parents' home in Maryland.

100.    On November 18, 2020, Plaintiff filed a complaint with the North Carolina Department of Labor, charging Defendants with unlawful retaliation under REDA. Said complaint was filed within 180 days of the last retaliatory act by Defendants.

101.    On March 1, 2021, the North Carolina Department of Labor issued Plaintiff a right-to-sue letter. *See* NCDOL 90-Day Right-to-Sue Letter, attached hereto as Exhibit A.

102.    Plaintiff instituted a private lawsuit and filed the same within ninety (90) days of receipt of the NCDOL's right to sue letter.

## **FIRST CAUSE OF ACTION**
### **Violation of the Fair Labor Standards Act**
### **29 U.S.C. § 201, *et seq*.**

103.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

104.    At all relevant times, Defendants have been, and continue to be, an

"employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

105.    At all relevant times, Defendants, individually and jointly, have had gross operating revenues in excess of $500,000.

106.    The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d). The FLSA defines "employ" broadly, to cover anyone who is "suffer[ed] or permit[ed] to work." 29 U.S.C. § 203(g).

107.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendants, to compensate all non-exempt employees at least minimum wage for all hours worked and a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

108.    At all relevant times, Plaintiff was a non-exempt, covered employees pursuant to the FLSA.

109.    Plaintiff typically worked greater than forty (40) hours per week.

110.    At all relevant times, Defendants, pursuant to their uniform policies and practices, willfully failed and refused to pay for all hours worked to Plaintiff.

111.    Defendants maintained a practice of disregarding Plaintiff's time records and removing overtime hours worked when calculating hours worked for purposes of Plaintiff's earning statements, consistent with Defendants' corporate policies, in order to avoid compensating Plaintiff regular and overtime wages.

21

112.    Despite Plaintiff regularly working over sixty (60) hours per week, and accurately documenting the same, Defendant only compensated Plaintiff his regular hourly rate for up to 86.67 hours worked per two-week pay period and Plaintiff did not receive all straight-time wages or overtime compensation for all of his documented hours worked.

113.    Defendants have willfully engaged in such conduct in violation of the FLSA by engaging in a pattern or practice of permitting or requiring Plaintiff to work without compensation at the applicable straight-time rate for all hours worked and/or overtime rate for all hours worked over forty (40) per week.

114.    As Defendants maintained a practice of disregarding Plaintiff's actual hours worked and only compensating Plaintiff for up to 86.67 hours worked per two-week pay period, despite having access to Plaintiff's timekeeping records and ultimately preventing Plaintiff from receiving straight-time and overtime compensation for all overtime hours worked, Defendants willfully and knowingly failed to compensate Plaintiff all earned compensation.

115.    Defendants' knowledge of its obligations under the law is evidenced by Plaintiff's timesheets, which accurately document Plaintiff's hours worked, Plaintiff's straight-time hourly rate ($18.00 per hour), and Plaintiff's corresponding overtime hourly rate ($27.00). Still, Defendants failed to compensate Plaintiff for all hours worked and at the applicable rate.

116.    As a result of Defendants' willful failure to pay Plaintiff as required by law, Defendants owe Plaintiff back wages, including for regular hours worked and for hours worked in excess of forty (40) at a rate of at least one and one-half (1.5) times his regular

rate of pay as well as liquidated damages in an amount equal to the amount of unpaid wages. As stated, for one week alone, Plaintiff is due approximately $481.08 in unpaid wages.

117. Defendants' failure to pay Plaintiff for all hours worked, and at the appropriate overtime rate for all hours worked in excess of forty (40) per week, in weeks where Plaintiff worked over 40 hours, despite the fact that Defendants knew of its obligations under the law and actively disregarded Plaintiff's reported hour worked and hourly rates, entitles Plaintiff to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b).

118. Since Defendants cannot show they acted in good faith, especially in light of Defendants' consistent practice of refusing to compensate Plaintiff for all hours worked, a three (3) year, rather than two (2) year statute of limitations, applies, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

## COUNT TWO
### Violation of the North Carolina Wage and Hour Act
### N.C. Gen. Stat. § 95-25.6

119. Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

120. It is unlawful under North Carolina law for an employer to "suffer or permit" an employee to work without paying promised and earned wages for all hours worked, pursuant to N.C. Gen. Stat. § 95-25.6.

121. Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, Defendants were required to pay Plaintiff all wages . . . accruing to the employee on the regular payday,"

including owed, earned, accrued, and/or promised wages." This requirement is not covered by the minimum wage or overtime provisions under the FLSA.

122. The NCWHA includes in its definition of "wage," among other forms of compensation, "commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments."

123. The NCWHA also requires, under N.C. Gen. Stat. § 95-25.7, that when an employee's employment is discontinued for any reason, the employee "shall be paid all wages due on or before the next regular payday," and that "[w]ages based on bonuses, commissions or other forms of calculation shall be paid on the first regular payday after the amount becomes calculable when a separation occurs."

124. Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2). Pursuant to N.C. Gen. Stat. § 95-25.13(1)-(2). Importantly, as it relates to wage calculations, "[a]mbiguous policies and practices *shall* be construed against the employer and in favor of the employees." *See* 13 N.C. Admin. Code 12.0307.

125. Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Plaintiffs' NCWHA claims are separate and distinct from Plaintiff's overtime claim under the FLSA. Defendants were required to pay Plaintiff all wages earned and accrued each week, when due, for all promised, earned, and accrued regular, straight, and premium wages of one and one-half times the promised wage rate for hours in excess of forty (40)

24

each week, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

126.    To date, Plaintiff has not received all earned and accrued compensation for all hours worked, as promised (and at rates documents on Plaintiff's timesheets), which would be subject to Plaintiff's promised, hourly rate of $18.00 per hour for all hours worked up for forty (40) in a week and the promised, premium rate of $27.00 for all hours worked in excess of forty (40) in a week.

127.    Plaintiff's hourly wages for work performed during each week were to be regular, nondiscretionary, system, based on a fixed formula, and paid out as Plaintiff continued to be employed by Defendants.  Defendants' failure to pay such wages is therefore a violation of the NCWHA.

128.    Additionally, under the NCWHA, N.C. Gen. Stat. §§ 95-25.6, 95-25.7, and 95-25.12, Defendants were obligated to compensate Plaintiff for his accrued vacation and sick earnings as of the date of his wrongful termination, in light of Defendants' silence on any potential PTO forfeiture.  Defendants have failed to compensate these earnings.

129.    Defendants intentionally refused to pay all wages due as set forth in the preceding paragraphs of this Complaint to Plaintiff in violation of the NCWHA.

130.    The foregoing conduct, as alleged, constitutes willful violations of the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6.

131.    Defendants cannot show to the Court that "the act or omission constituting the violation [of the NCWHA] was in good faith and that [Defendants] had reasonable

25

grounds for believing the act or omission was not a violation." For example, Defendants knew of the legal obligations to compensate Plaintiff for all hours worked, as evidenced by Defendant requiring Plaintiff to document hours worked, but Defendant simply chose to ignore such records and failed to comply with the NWCHA's requirements to compensate Plaintiff all earned and accrued wages, as promised, entitling Plaintiff to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

132.    As set forth above, Plaintiff has sustained losses and lost compensation as a proximate result of all of Defendant's violations. Accordingly, Plaintiff seeks damages in the amount of his unpaid earned compensation, liquidated damages, plus interest at the legal rate set for in N.C. Gen. Stat. § 95-25.22(a) and (a)(1).

133.    Plaintiff seeks recovery of his attorney's fees as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(d).

**COUNT THREE**
**Violation of the Family Medical Leave Act**
**29 U.S.C. § 2601, *et seq*.**
**(Interference)**

134.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

135.    Among the stated purposes of the FMLA, under 29 U.S.C. § 2601(b)(1) and (2), are to "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity," and "to entitle employees to take reasonable leave for medical

26

reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."

136. The FMLA, pursuant to 29 U.S.C. § 2615(a)(1), prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the FMLA]."

137. Further, an employer must provide an employee of the eligibility to take FMLA leave once the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason. *See* 29 CFR § 825.300 (b)(1).

138. Refusing to authorize FMLA leave, discouraging an employee from using such leave, and manipulation to avoid responsibilities under the FMLA are qualifying examples of forbidden interference with an employee's right to seek FMLA leave. *See* 29 C.F.R. 825.220(b).

139. At all relevant times, Plaintiff was an eligible employee under the FMLA, 29 U.S.C. § 2611(2), since he had been employed for at least twelve months by Defendants, and he had provided at least 1,250 hours of service with Defendants during the preceding twelve-month period.

140. At all relevant times, Defendants were an "employer" engaged in "commerce or in any industry or activity affecting commerce," which employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, within the meaning of the FMLA, 29 U.S.C. § 2611(4).

141. On or about July 2019, Plaintiff's son suffered life-threatening injuries after

being hit by a car, which required Plaintiff to stay in the hospital with his son and make critical medical decisions while his son received treatment in the Intensive Care Unit. Plaintiff's son's injuries qualified as a serious health condition, pursuant to 29 C.F.R. §§ 825.113-115.

142.    Plaintiff informed Defendants that he would need time off work to help care for his family. Despite knowing of Plaintiff's need for medical leave to help care for his family member, Defendants did not inform Plaintiff of his rights to family medical leave or the proper procedure to follow when seeking leave.

143.    While Plaintiff provided notice to Defendants of his son's serious health condition and need for FMLA-qualifying leave, Defendants failed to provide eligibility notice under 29 C.F.R. § 825.300(b), rights and responsibilities notice under 29 C.F.R. § 825.300(c), or designation notice under 29 C.F.R. § 825.300(d).

144.    As provided in the FMLA regulations, 29 C.F.R. § 825.300(e), failure to follow notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

145.    Defendants interfered with Plaintiff's FMLA right by failing to provide Plaintiff any notice or information or his rights under the FMLA and discouraging Plaintiff from seeking FMLA leave for an extended duration, including calling Plaintiff to return to work after only two weeks of caring for his son. In other words, after only four, nonconsecutive weeks, Plaintiff had to leave his son in ICU and return to work full-time, despite his son's continued need for Plaintiff to remain available in order to make medical decisions.

146.    The FMLA interference violation of Defendants, as described herein, was not in good faith, and Defendants did not have reasonable grounds for believing that their acts or omissions were not a violation of the FMLA, entitling Plaintiff to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

147.    Defendant's violations entitle Plaintiff to all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, monetary losses sustained, an equal amount of liquidated damages, interest at the prevailing rate, and attorneys' fees and costs.

**COUNT FOUR**
**Violation of the Family Medical Leave Act**
**29 U.S.C. § 2601, *et seq.***
**(Retaliation)**

148.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

149.    The FMLA, pursuant to 29 U.S.C. § 2615(a)(2) and 29 C.F.R. § 825.220(c), prohibits employers from discriminating or retaliating against an employee for exercising or attempting to exercise their FMLA rights.  This includes using an employee's exercise or attempted exercise of FMLA rights as a negative factor in employment actions, such as adverse treatment, disciplinary actions, or termination.

150.    The FMLA, pursuant to 29 U.S.C. § 2614(a), prohibits an employer from discharging an employee for taking FMLA leave and requires that an employee must be restored to the position of employment held by the employee when the leave commenced.

151.    Defendants retaliated and/or discriminated against Plaintiff for exercising or attempting to exercise his FMLA rights by harassing Plaintiff for taking limited leave to

29

help care for his son in the hospital, chastising Plaintiff that Defendants need Plaintiff to return to work, and ultimately terminating Plaintiff's employment, alleging meetings missed during the time he was caring for his son as a cause for the termination.

152.    The FMLA retaliation violation of Defendant, as described herein, was not in good faith, and Defendant did not have reasonable grounds for believing that its acts or omissions were not a violation of the FMLA, entitling Named Plaintiff to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

153.    Defendant's violations entitle Plaintiff to all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, monetary losses sustained, an equal amount of liquidated damages, interest at the prevailing rate, and attorneys' fees and costs.

## COUNT SIX
### Violation of the North Carolina Retaliatory Employment Discrimination Act N.C. Gen. Stat. § 95-240

154.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

155.    Defendants, separately and jointly, employed more than 15 employees at all relevant times.

156.    Defendants are a person within the meaning of N.C. Gen. Stat. § 95-240 (1).

157.    Defendants are an "employer" within the meaning of N.C. Gen. Stat. § 95-240.

158.    Filing a claim or complaint, initiating any inquiry, investigation, inspection, proceeding or other action, or testifying or providing information to any person with respect to the General Statutes is a protected activity under N.C. Gen. Stat. § 95-243.

159.    North Carolina law prohibits employers from taking retaliatory action against an employee if they "[f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" the North Carolina Wage and Hour Act, N.C Gen. Stat. § 95-25.1 *et seq*. N.C. Gen. Stat. § 95-241. This includes using an employee's exercise or attempted exercise of rights under the as a negative factor in employment actions, such as adverse treatment, disciplinary actions, and/or termination. *Id.*

160.    By repeatedly reporting his concerns related to Defendants' compensation practices, including editing of hours worked as documented on earning statements and not compensating Plaintiff for all hours worked, and initiating an investigation into Defendants' pay practices, including by alerting multiple leaders within Defendants' organizations, Plaintiff exercised his rights as listed under N.C. Gen Stat. § 95-241(a) and engaged in protected activity.

161.    Defendants' hostile treatment towards Plaintiff following his inquiry into Defendants' compensation practices and discriminatory practices as well as the termination of Plaintiff's employment was a willful violation of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240 *et seq*.

162.    Defendants further violated willfully REDA by terminating Plaintiff, who had requested evidence of Defendant's unlawful pay practices, including requesting copies of records which demonstrate Defendants' intentional refusal to compensate Plaintiff for all hours worked, and in anticipation of Plaintiff filing a complaint with USDOL or NCDOL. On the eve of Plaintiff's anticipated receipt of documents evidencing Defendants'

31

unlawful pay practices, Defendants preemptively terminated Plaintiff.

163.    As a proximate result of Defendants' conduct, Plaintiff has suffered damages, including, but not limited to, lost wages, severe emotional distress, humiliation, anxiety, and other compensatory damages.

164.    Accordingly, Plaintiff is entitled to lost wages, lost benefits, and other economic losses as well as treble damages pursuant to N.C. Gen. Stat. § 95-243.

## COUNT SEVEN
### Wrongful Discharge in Violation of North Carolina Public Policy
### North Carolina Common Law

165.    Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

166.    It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. § 95-240, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, including REDA, prohibits employers from taking retaliatory action against an employee for exercising his rights under the law and, more generally, that employees be free from harassment, discrimination, and retaliatory treatment in their employment.

167.    North Carolina law prohibits discrimination or retaliation against an employee for exercising rights protected under the North Carolina General Statutes. N.C. Gen. Stat. § 95-241(a).

168.    Plaintiff participated in legally protected activity by pursuing lawful employment with the expectation of having his constitutional and statutory rights respected and preserved by Defendants.

32

169.    Defendants violated these public policies by terminating Plaintiff after he reported that Defendants were not compensating him as required under the law and after Plaintiff initiated an investigation into such unlawful practices.  Such employer conduct has a tendency to be injurious to the public policy of North Carolina and against the public good.

170.    The termination of Plaintiff's employment, resulting from his initiating an investigation into Defendants' unlawful pay practices, was wrongful as against the public policy of the State of North Carolina.

171.    Such termination proximately caused Plaintiff to suffer lost income, emotional distress, and other losses.  Accordingly, Plaintiff is entitled to compensatory damages under North Carolina law and interest pursuant to N.C. Gen. Stat. § 24-5(b).

172.    Defendant's actions were done maliciously, willfully, or wantonly and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants' officers, managers, and directors participated in and condoned the conduct described above. As a result, Plaintiff is entitled to recover punitive damages from Defendants pursuant to N.C. Gen. Stat. § 1D-15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court:

1.    Award Plaintiff actual damages for reimbursement of unpaid wages, unlawfully withheld wages, and liquidated damages equal in the amount of the unpaid compensation found due to Plaintiff as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a1) and pursuant to the FLSA, 29 U.S.C. § 216(b);

33

2.      Award Plaintiff pre- and post- judgment interest at the statutory rate, as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a), and pursuant to the FLSA, 29 U.S.C. § 216(b);

3.      Award Plaintiff attorneys' fees, costs, and disbursements, as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(d) and NCPDPA, N.C. Gen. Stat. § 168A-11(d), and pursuant to the FLSA, 29 U.S.C. § 216(b);

4.      Award Plaintiff all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, and monetary losses sustained, as a result of Defendant's unlawful actions under the FMLA and REDA;

5.      Award Plaintiff interest at the prevailing rate, as provided under 29 U.S.C. § 2617(a)(1)(A)(ii) and N.C. Gen. Stat. § 95-243(c);

6.      Award Plaintiff treble damages, as provided under N.C. Gen. Stat. § 95-243(c);

7.      Award Plaintiff attorney's' fees and costs, as provided under 29 U.S.C. § 2617(a)(iii) and N.C. Gen. Stat. § 95-243(c).

8.      Award Plaintiff all compensatory damages due as a result of Defendants' unlawful acts;

9.      Award Plaintiff all consequential damages due as a result of Defendants' unlawful acts;

10.     Award Plaintiff punitive damages for Defendants' willful, wanton, and malicious conduct;

11.     Award Plaintiff all costs incurred in the prosecution of this action, including

34

reasonable attorney's fees;

12.    Award Plaintiff pre-judgment interest; and

13.    Award Plaintiff further legal equitable relief as this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this May 27, 2021.

*/s/ Gilda A. Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Charlotte C. Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*

35