## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOHNNIE WEBB, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 1:21CV424 |
| DAYMARK RECOVERY SERVICES, | ) |
| INC.; and FREEDOM HOUSE | ) |
| RECOVERY CENTER, INC. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Johnnie Webb, Jr. worked for years for Defendant Freedom House Recovery Center, Inc. ("Freedom House") until his termination on May 26, 2020. He alleges that during his employment Defendants Daymark Recovery Services, Inc. ("Daymark") and Freedom House failed to pay him all of the overtime and straight time he earned, failed to provide him notice of his rights and responsibilities under the Family and Medical Leave Act ("FMLA"), and terminated him in retaliation for his inquiries about his pay and his taking leave to care for his injured son. This matter is before the Court on motions for summary judgment by Webb, [Doc. #52], and Freedom House, [Doc. #54]. For the reasons stated below, Webb's motion is denied and Freedom House's motion is granted as to each retaliation claim and otherwise denied.

I.[1]

A.

Freedom House and Daymark specialize in providing mental health and addiction services to clients in North Carolina. (Decl. of Heather Griffin-Dolciney ¶ 3 (May 31, 2022) [Doc. #56-3])[2]; Dep. of Billy R. West, Jr. 31:16-20 (Mar. 28, 2022) [Doc. #41-4].)[3] Webb began working with Freedom House in 1991 as a healthcare counselor until he left five years later. (Dep. of Johnnie Webb, Jr. by Daymark ("DM Webb Dep.") 21:21-22:11 [Doc. #56-1].) He returned in 1998 and has since held several related positions – assistant manager of a men's halfway house in Durham, healthcare counselor at Durham Center Access and Freedom

---

[1] Some evidence cited in this Opinion can be found at more than one docket entry. For ease of reading, only one of those entries is cited.

[2] Webb contends that this declaration should be stricken because it contradicts Griffin-Dolciney's deposition testimony and the factual record, improperly relies on hearsay, and inappropriately references documents without attaching or citing to them. (Pl.'s Resp. in Opp'n to Def. Freedom House's Partial Mot. for Summ. J. at 11-12 [Doc. #62].) While a party cannot create a genuine dispute of material fact by submitting a declaration contradicting a deponent's prior testimony, e.g., Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984), Griffin-Dolciney's declaration does not contradict her deposition testimony. Evidence that would be inadmissible at trial (such as hearsay) cannot be considered on summary judgment, e.g., Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991), but the allegedly offending statements in Griffin-Dolciney's declaration used here are offered "'as an explanation of why [Freedom House] believed that terminating [Webb's] employment . . . was necessary and appropriate,'" and therefore, are not hearsay, see e.g., Arrington v. E.R. Williams, Inc., 490 F. App'x 540, 543 (4th Cir. 2012) (unpublished) (quoting Royall v. Nat'l Ass'n of Letter Carriers, 507 F. Supp. 2d 93, 98 n.10) (D.D.C. 2007)). The declaration will not be stricken.

[3] Webb relies on West's deposition that was submitted in support of Webb's earlier initial motion for sanctions.

2

House's Chapel Hill campus, peer support specialist, and part-time mobile crisis counselor. (Id. 22:12-25:19; Resume [Doc. #53-3].)  Over the years, his performance evaluations by various supervisors were positive. (Healthcare Technician Evaluation (Aug. 2002); Healthcare Counselor (November 2005, July 2010, June 2018); Peer Support Specialist (June 2017) [Doc. #53-4].)

In 2018, Freedom House affiliated with Daymark, and Daymark assumed oversight of Freedom House's Mobile Crisis Team in late 2018. (Decl. of Griffin-Dolciney ¶¶ 5, 6.)  The Mobile Crisis Team "provides crisis intervention and prevention to individuals who request assistance for a crisis related to mental health, substance abuse, or developmental disability concerns." (Id. ¶ 4.)

All of Freedom House's client calls were routed through Daymark's dispatch center, (id. ¶ 6), and Daymark's Director of Mobile Crisis Division not only oversaw Daymark's command center's operations but also Freedom House's Mobile Crisis Team (referred to as Mobile Engagement Team ("MET") by Daymark), (Decl. of Kimberly Anthony-Byng ¶¶ 3, 4 (June 29, 2022) [Doc. #63-2]).  This was to ensure that  Freedom House had the necessary advice and counseling to comply with applicable standards. (Id. ¶ 4.)  Freedom House's mobile crisis clinicians ("MCCs") continued to report to a Team Lead employed by Freedom House but the Team Lead reported to Daymark's Director of Mobile Crisis Division until January 2020 when Freedom House's Clinical Director took over supervision of the MET. (Decl. of Griffin-Dolciney ¶ 6; Dep. of Heather Griffin-Dolciney 26:17-27:4 (Mar. 28, 2022) [Doc. #44-5].)

3

In November 2018, Daymark's then-Director of Mobile Crisis Division Kim Anthony-Byng interviewed Webb, among others, in preparation for their continued work as MCCs with oversight by Daymark and "was VERY impressed" with Webb.[4] (Emails among Anthony-Byng and Freedom House and Daymark staff) [Doc. #53-15].) In December 2018, Webb received an offer letter from the MET Team Lead at Freedom House, Detra Renee Baker, for "a full-time, salaried, non-exempt position as a Mobile Crisis Clinician beginning January 2, 2019 . . . working Monday through Thursday on the 5:00 p.m. to 8:00 a.m. shift." (Offer Letter [Doc. #56-6].) There would be a three-month probationary period after which his job performance would be evaluated and he would be given regular agency status, further probation, or terminated. (Id.) He accepted the offer and began working as a full-time MCC in January 2019. (Dep. of Johnnie Webb, Jr. by Freedom House ("FH Webb Dep.") 124:15-16 [Doc. #53-2].)

As a part-time MCC, Webb had been covering three counties (Orange, Durham, and Person), but when he became a full-time MCC (with Daymark overseeing the MET), he covered five counties (Orange, Durham, Person, Caswell, and Alamance), (FH Webb Dep. 78:2-16), and, as a result, caseloads increased, (Decl. of Clayvon Everett ¶ 17 (June 1, 2022) [Doc. #53-6]). There were other

---

[4] Heather Griffin-Dolciney, Freedom House's Clinical Director, testified at her deposition that Freedom House employees Renee Baker (the Team Lead) and Ivy Williams (Human Resources Director), as well as Anthony-Byng, were involved in hiring Webb for this full-time MCC position. Anthony-Byng "would have been in discussions with [the Team Lead] about anyone she was considering hiring for the team." (Griffin-Dolciney Dep. 14:17-15:16.)

changes, as well. Daymark was "heavily structured" and had methods and standard processes that MCCs were expected to implement in their work. (Id. ¶¶ 14, 15.)

As an MCC responding to "acute mental health breakdowns, drug or alcohol overdoses, suicidal individuals, or violence or threats to third parties, it was critical that [Webb] act quickly" when he received a client call. (Decl. of Griffin-Dolciney ¶ 11.) He was "also responsible for documenting interactions with clients and submitting information that would permit [Freedom House] to bill insurers for the services provided." (Id. ¶ 12.) "MCCs were required to enter notes for each call into Daymark's electronic system, called 'BUI'" and "to complete clinical assessments [whenever possible], for which [Freedom House] could receive reimbursement, and to document the client services in Freedom House's system, called 'Alpha' or 'Wellsky'." (Id. ¶¶ 13, 14, 17; see also FH Webb Dep. 80:24-81:6 (describing having "a whole new system [with Daymark] to deal with as well as the Freedom House system").) More simply, Webb was to – and always did, according to Webb – document fairly basic information for Daymark about each call while also completing a more thorough assessment for Freedom House. (FH Webb Dep. 82:21-84:6.) "The information gathered in an assessment is used to evaluate the individual's mental state and determine appropriate services." (Decl. of Griffin-Dolciney ¶ 15.)

5

B.

Prior to this new position, as a part-time MCC Webb earned "a flat rate [of $50] for [being] on-call" and an hourly rate of $18 when he responded to a call. (Dep. of Ivy Williams 27:13-16, 29:1-3 (Apr. 19, 2022) [Doc. #44-6].) The offer letter for the full-time position explained that the "position has a gross annual salary of $37,440.00" with a "semi-monthly gross salary" of "$1,560.00" which "includes a stipend for working the evening shift." (Offer Letter.) Although he would be on-call as before, "rather than getting $50 for a 24-hour period, he was going to be given a salary rate, where he might get called out and might not get called out, but he would be ahead of the game." (Williams Dep. 118:1-18.) On January 9, 2019, Williams emailed Webb to alert him that his paycheck the following week would show his on-call rate through December 31, his former healthcare counselor hourly rate of $14.50 through January 1, and his "rate for mobile crisis and new salary rate of $18/HR," and twelve hours of vacation leave owed from the last pay period. (Email among Williams, Webb, and others [Doc. #53-21].)

According to Webb, pay issues arose once he began as a full-time MCC. He testified at his deposition that when he received his first paycheck in January 2019 as a full-time MCC, he noticed that his pay did not correspond to his timesheets. So he spoke with Anthony-Byng who told him he was only being paid for 10 hours, rather than 15 hours, per shift. He then went to Ivy Williams, Freedom House Director of Human Resources, "and explained the situation to her," showed

6

her his paystubs, and told her that he was not being paid for all of the hours he was working. She told Webb to talk to Anthony-Byng because Daymark was paying his salary.

In March 2019, he spoke again with Anthony-Byng about the discrepancies between his paycheck and timesheets. She gave Webb "a couple of choices" – he "could leave" or he "could go back to the position [he] had before as a health care counselor." Webb then met with both Williams and Anthony-Byng, and Anthony-Byng again explained that he was being paid for 5 p.m. to 3 a.m. because he worked from home. Finding no resolution for these issues, Webb kept working and saving his time sheets.

In addition to working his scheduled shifts, Webb took extra shifts and entered that time into the pay system along with the time he worked for his regular shifts. In June or July 2019, Anthony-Byng and Williams met with him to give him a separate form to track those hours because he was "creating too many hours in the PrimePay system." So he began writing down the days and times he worked extra shifts and turning in the form at the end of the pay period to his Team Lead "so [he] could get paid for the hours that [he] worked over [his] regular shift." But, he stopped working overtime "after [his] son got sick", "[p]robably August", and "never worked another hour over since."

After inquiring of Anthony-Byng and Williams in early 2019 about his pay issues, Webb did not speak with anyone again about his pay concerns until January 2020 when he asked Williams for a copy of all of his timesheets which

7

she provided. But, instead of his PrimePay timesheets, these timesheets labeled "Freedom House" did not include the same information as his PrimePay timesheets. Williams told Webb that was "the paperwork that Freedom House had."

In early February 2020, he spoke with Williams one more time to ask how he could obtain his PrimePay timesheets, and she explained he would need to create a PrimePay account so he could pull those records himself. After Webb's friend and colleague Keith Haynie unsuccessfully tried to help him create a PrimePay account, Webb asked LaWandra Edwards, the Human Resources Assistant, for those records, which she provided. (FH Webb Dep. 92:18-21, 100:23-104:24, 110:3-8, 120:10-138:21.)

For her part, Anthony-Byng avers that she does not recall Webb complaining to her that he was not paid for all of the hours he worked and that she never gave him an ultimatum. (Decl. of Kimberly Anthony-Byng ¶¶ 9-10 (June 29, 2022) [Doc. #63-2].) Williams testified that Webb did not complain to her that he was not being paid what he was due. (Williams Dep. 141:22-142:1.)

C.

Meanwhile, back in June 2019, months after Webb contends he last spoke with Anthony-Byng about his pay, she conducted[5] his probationary performance evaluation. He received ratings of "Excellent" or "Acceptable" for all performance measures except documentation. Anthony-Byng described him as "very pleasant

---

[5] The Offer Letter expected that Webb's Team Lead, rather than Anthony-Byng, would evaluate his probationary job performance.

Case 1:21-cv-00424-NCT-JLW   Document 116   Filed 12/20/22   Page 8 of 36

and easy to communicate with", noting that "he gets along well with the dispatchers who give him calls" and "works hard to provide good services to clients he serves." But, he needed to improve his documentation and communication with the command center, including sending dispositions[6] at the end of each shift. (Freedom House Performance Evaluation [Doc. #53-4].) Around the same time, Webb was assigned to Byron Brooks, PhD for supervision and one-hour weekly individual meetings to develop the skills necessary to fulfill "12 Core Functions." (Freedom House Clinical Supervision Plan Fiscal Year 2019 [Doc. #56-13].)

The following month, in July 2019, Webb's Team Lead changed from Baker to Trish Burkert. (Decl. of Griffin-Dolciney ¶ 8.) Soon afterwards that same month, Webb's son was hospitalized in Maryland after suffering serious injuries. Webb called Burkert, Anthony-Byng, and Williams to tell them that his son was seriously injured and in the intensive care unit ("ICU"), and that he needed to use his accrued leave (of which he had over eight weeks of sick and annual leave) to care for his son and did not know when he would return to work. Webb was told to go care for his son and Williams would take care of his leave. (FH Webb Dep. 110:16-115:17.) At no time during these conversations did Burkert, Anthony-Byng, or Williams notify Webb of his rights and responsibilities under the FMLA. (FH Webb

---

[6] Because Daymark cannot access Freedom House's electronic medical records, Freedom House MCCs must complete dispositions and send them to dispatch so that dispatch knows how clients have been assisted and which clients still need assistance. (West Dep. 60:4-61:2, 67:11-25.)

Dep. 187:16-189:2; Williams Dep. 123-124 (testifying that she would have documented any communications with Webb or paperwork she gave him advising him of his FMLA rights and, if there is no such documentation, it is fair to presume she did not discuss FMLA with Webb); Dep. of Joyce Tucker Harper 57:9-60:25 (Mar. 28, 2022) (testifying that she found no documentation or notes in Webb's personnel chart reflecting any discussion about FMLA or his need for FMLA leave) [Doc. #44-4].)

While Webb was in Maryland, he spoke with Burkert several times about his son's progress and when Webb might return to work. After Webb had been there two weeks, Burkert called to tell him that he was scheduled for two weekend shifts and she had no one to cover. Webb told her that his son was still in the ICU and had not yet awoken. But Burkert asked if he could "at least just come back and work the shift" which Webb did. He then returned to Maryland for three weeks but came back to work because he only had "a couple of weeks left" and "didn't want to burn all [his] time in case something else happened to [his son]." However, had he been advised that he "could take up to 12 weeks of unpaid leave", he "would have used some leave time" to spend with this son. When he returned to work after taking leave, no one treated Webb negatively or differently. (FH Webb Dep. 110:16-120:6, 189:3-12.)

D.

Months later, in October 2019, Burkert was notified by Daymark's Mobile Crisis Dispatch Team Lead Khara Saunders that dispatchers were complaining to

10

her about Webb's attitude when he received a call for Person Memorial Hospital. During the call with dispatch, he would ask who else was working and suck his teeth, take deep breaths, and make long sighs. When he did respond to the call, he failed to update the hospital with his arrival time. (Email from Saunders to Burkert [Doc. #56-9].)

The following day, Burkert completed an Employee Disciplinary Action Form identifying these ongoing issues with dispatch, as well as Webb's failure to timely return calls, texts, or emails from her, the Program Director, or dispatch, and late work that affected other clinician's work. (Employee Disciplinary Action Form [Doc. #56-11]. Cf. DM Webb Dep. 66:13-68:11 (recalling a meeting in September or October 2019 with Anthony-Byng and a Team Lead to discuss an issue when a dispatcher repeatedly called him when he was attending to a client at an elementary school and that he signed "a piece of paper").)

At his deposition, Webb remembered talking to Burkert once "concerning calls coming into the crisis unit" when "[t]hey said I was talking back, being vocal to dispatchers." As for the disciplinary action form, Webb acknowledged his signature, although he did not recall the form, claims not to have seen it until it was shown to him at his deposition, and denied doing any of the things identified as the reasons for the discipline. He testified that no one had ever had a conversation with him about any of the issues identified in the disciplinary action. (DM Webb Dep. 68:20-23; FH Webb Dep. 142:14-148:16, 191:18-192:6.)

11

Throughout October 2019, Burkert continued to have problems with Webb's dilatory communication and notified Williams and Anthony-Byng. Williams remembered that these were some of the same issues Webb had when he was a peer support specialist but Williams thought it was a personality conflict with his then-supervisor. Burkert confirmed with IT that emails were being delivered to Webb's Freedom House email account, although not to his Daymark account. (Emails among Burkert, Williams, and Anthony-Byng [Doc. #56-10].) However, at his deposition, Webb testified that his Daymark email had "always been fine" but that, at some point, his Freedom House email was not working. (FH Webb Dep. 157:22-158:4.) In mid-January 2020, Burkert was still having problems with email communications with her MCCs but told them, including Webb, that they were responsible for maintaining both email accounts. (Email from Burkert to staff [Doc. #53-26].) For his part, Webb considers himself not to have received an email if it is sent at a time of day when he is not working. (FH Webb. Dep. 157:7-160:1.)

Also in mid-January 2020, Burkert inquired about Dr. Brooks' clinical supervision of Webb. She learned that Dr. Brooks had not seen Webb in months. Dr. Brooks' impression of his supervision of Webb was "that it was in prep for CSAC" and he "saw it as a favor for the previous MET supervisor." After learning this, Anthony-Byng supported a write-up of Webb, as did Williams, but Williams also explained that Webb's responsibility to follow up with Dr. Brooks may not have been made clear to him. Nevertheless, she noted that they had "gone

12

through this several times and Johnnie has been here long enough to know that he needs to receive supervision which has been documented on agency forms." (Emails among Burkert, Brooks, Williams, and Anthony-Byng [Docs. #53-28, #56-14].)

A few days after those discussions, on January 16, Burkert emailed Webb to schedule a meeting to start his clinical supervision "ASAP" because "it is a state requirement." A few days later, she emailed Webb (a second time) about months' old care reviews that he had yet to complete and send to Saunders. (Email from Burkert to Webb [Doc. #57-2].)

As of January 22, Burkert had received no response to her January 16 email to Webb about his clinical supervision. She emailed him again and reiterated that his time without supervision put the MET at risk and that he was to respond by the end of his shift or she would move forward with disciplinary action. (Emails from Burkert to Webb [Doc. #56-15].)

Having been copied on that email, Anthony-Byng responded to Burkert, Williams, and Heather Griffin-Dolciney (Freedom House's Clinical Director who would soon take over supervision of the MET),

> Johnnie has continued to be a problem over the last several months. It feels like we beg him to do his job and to work as he is supposed to. I [h]ave emailed him at least 5 times or so over last few months, encouraging him to stop putting needs no follow up on dispositions for clients who could use some follow up, but he never changes what he does, continuing to put needs no follow up as if my words mean nothing. I know it is a process, but just wanted you to know that he is just not appropriate for this level of service in my opinion. He lacks the sense of urgency that you need to do crisis work.

13

(Email from Anthony-Byng to Burkert, Williams, Griffin-Dolciney [Doc. #57-3].)  For example, residents from a Durham housing project were displaced to local hotels and the managed care organization for Durham, Alliance, requested MCCs to come onsite to talk with the residents to offer mental health services and assistance. Burkert and Webb, among other MCCs, responded.  All except Webb returned having made referrals and provided follow-up.  Webb reported that no one he spoke with needed any assistance. (Williams Dep. 128:3-129:11; Decl. of Griffin-Dolciney ¶ 24.)

Williams, Burkert, Anthony-Byng, Griffin-Dolciney, and Dr. Brooks continued discussing Webb's supervision, or lack thereof.  According to Dr. Brooks' records, his last supervision meeting with Webb was in June 2019.  Williams described Webb's behavior as exhibiting "Negligence, Failure to Follow Instructions (Written and Oral), and Insubordination."  Burkert thought that, if correct, it warranted immediate termination.

Dr. Brooks told Griffin-Dolciney and Williams that Webb had called numerous times to cancel or reschedule saying he was busy or tired, and, until Webb "popped in" after he returned from Maryland to say he wanted to restart their sessions (which they did not do), Dr. Brooks thought Webb was no longer with Freedom House. (Emails among Williams, Burkert, Anthony-Byng, and Griffin-Dolciney [Doc. #62-4]; Emails among Anthony-Byng, Williams, and Brooks [Doc. #56-14].)  On January 28, Burkert emailed Webb again about the need to begin his

14

clinical supervision and warned him that if he did not address the issue that week, she would remove him from the schedule until he was "re-engaged in supervision." (Email from Burkert to Webb [Doc. #53-24].) Testifying at his deposition, Webb recalled only missing supervisory meetings when he was in Maryland with his son, although he could not say that he went to all of his clinical supervision meetings in 2020. (FH Webb Dep. 151:13-152:3.)

Recognizing that the server was "hit or miss", on January 30, Burkert once again emailed her MET staff, including Webb, about email responsiveness, their responsibility for maintaining both email accounts, their accountability for the information being sent, and to alert her if there were technology issues so she could address them. In addition, Burkert reminded the staff of their job responsibilities and deadlines. (Email from Burkert to Williams [Doc. #53-24]; Email from Burkert to MET Staff [Doc. #53-25].)

That same day, Burkert completed an Employee Disciplinary Action Form & Performance Improvement Plan ("PIP") that identified Webb's continued failure to respond to email communications, his failure to comply with required clinical supervision (missing 26 out of 52 sessions for 2019 and not restarting supervision in 2020), and his failure to meet the minimum productivity requirement (completing assessments for only three clients in January). (Employee Disciplinary Action Form [Doc. #57-5].) At Webb's deposition, he acknowledged his signature on the document, but testified that prior to his deposition, he had never seen the January

15

30 disciplinary action form and the information in it was incorrect. (FH Webb Dep. 148:18-156:11.)

As part of his PIP, Burkert shadowed Webb's client calls for the month of February. (Decl. of Griffin-Dolciney ¶ 30.) During this period of monitoring, Webb's calls and documentation improved. But when Burkert's shadowing ended, Webb reverted to his old ways. (Williams Dep. 129:12-139:8.)

On April 2, Burkert emailed Webb again about his ongoing communication issues. He had been on probation in part for not checking email; they had worked together extensively to resolve his phone complications so he could receive emails; and he had signed a policy that he agreed to check his emails three times per shift. The mobile crisis orders were changing daily because of the pandemic, and, because he was not reading email, he was days behind everyone else with follow-up calls. She was writing up Webb and warned him "that by continuing to act against the plan that we set out in your last write-up, your job is at risk of being terminated." (Email from Burkert to Webb [Doc. #57-6].)

The following day, Burkert emailed Webb about his April 2 shift disposition. She explained that they were not meeting people in person at that time because of the pandemic and, instead, were conducting evaluations over the telephone and telehealth. The fact that he was not doing so suggested he was not fully aware of what was being asked of the team. She instructed Webb to go through his emails to find the one about setting up Doxy Clinic to do assessments unless he is specifically asked to assess in person. Burkert also advised Webb that, unless a

16

female client asks for a female clinician, not to ask female clients if they would be more comfortable with a female clinician because the staff is not large enough for that. She required Webb to respond to all of her emails even if she does not request a response or else he would be written up again. Burkert closed the email by telling Webb, "I will not fight to keep you employed if you continue to shirk your responsibilities. This is truly unacceptable and cannot continue to happen without very significant repercussions." (Email from Burkert to Webb [Doc. #57-7].)

A month later, on May 4, Burkert prepared a draft Employee Disciplinary Action Form in support of termination, listing Webb's continued failure to respond to all emails, lack of immediacy of crisis responsiveness, and failure to assess a client over the phone who could not participate in telehealth. This draft, along with Webb's October and January disciplinary actions, were sent to Cathy Shoaf, Daymark Director of Human Resources, for her review. (Email from Burkert to Williams and Griffin-Dolciney [Doc. #57-8]; Email from Williams to Shoaf [Doc. #62-5]; Email from Williams to Burkert [Doc. #57-16].) Ultimately on May 8, Williams told Burkert that they needed to do a 90-day PIP warning that failure to comply could result in termination. (Email from Williams to Burkert [Doc. #57-10].)

In the meantime, Burkert had emailed Webb about his care reviews. He had only provided her two of the twelve outstanding dispositions, an issue they had discussed in March when she told him that care reviews had to be completed for calls from a certain agency. Saunders could not complete requisite reports for the

17

state because Webb was not timely completing his work. (Email from Burkert to Webb [Doc. #57-9].)

Two weeks later, on May 20, Burkert emailed Griffin-Dolciney and Williams, attaching a productivity spreadsheet, in which she detailed Webb's poor productivity for April (as the lowest billing MCC clinician) and wondered if that should be added to the write-up. She also expressed,

> Johnnie is not competent to be in this position. He is finding ways to get around having to take calls and in doing so, is endangering the most at-risk client population we serve. . . . My take: financially, he is not even coming close to covering his own salary; his professional irresponsibility and incompetence adds considerable and consistently to my professional duties; in evading 18 out of 19 calls, he is clearly showing an inability to do the work; he failed to complete any clinical documentation in the electronic health record for 19 out of 20 calls; and, he lied in a client's clinical record about his arrival time, not by a few minutes but by an entire hour. I am requesting a conversation with both of you to discuss Johnnie's immediate removal from MET, as I no longer feel capable of supervising him without significant risk of jeopardizing my own license.

(Email from Burkert to Griffin-Dolciney and Williams [Doc. #57-11].) Williams forwarded the email to Shoaf asking, "Are we still going forward with a final warning for him or can we proceed to dismissal based on these findings?" (Email from Williams to Shoaf [Doc. #57-12].)

Meanwhile, Burkert emailed Webb about the lack of documentation for 19 of the 20 calls he received in April. (Email from Burkert to Webb [Doc. #56-3 at 16].) At his deposition, Webb disputed this, said he was "very good at what [he] did, [he] answered each and every call that [he] received," and he was "[v]ery

18

confident" the data would show that those 19 people "declined an assessment." (FH Webb Dep. 163:19-167:17.)

Griffin-Dolciney approved of Burkert's reaching out to the clients from whom Webb had taken calls in April, and it was determined that he falsified documentation in Daymark's electronic system per the reports of some of the clients and/or their family members. (Decl. of Griffin-Dolciney ¶ 38; Email from Williams to Burkert to Griffin-Dolciney [Doc. #62-6].) Having reviewed Burkert's notes from her calls, Griffin-Dolciney told Burkert and Williams, "[I]t seems he left vulnerable clients without needed support and potentially damaged the good name of the team by doing this." She recommended considering a complaint to the PSS certification body because of his unethical behavior.

Burkert again expressed to Griffin-Dolciney and Williams that she did want Webb on her team because "[h]e represents a known risk, and [she] [would] not continue to have him work under [her] license. It is far easier . . . to cover his shifts than continue to work as hard as [she had] been working to document his many professional failings." (Emails among Burkert, Williams, and Griffin-Dolciney [Doc. #62-6].)

Williams and Shoaf continued talking about Webb's performance and work history at Freedom House. Shoaf was ultimately of the opinion that termination was appropriate because "client risk is greater than agency risk." (Email from Shoaf to Williams [Doc. #62-7].)

On May 26, 2020, Shoaf emailed Duncan Sumpter (interim Freedom House

Director) and Jay Miller (interim Freedom House CEO) the following:

> We have an employee, Johnnie Webb, who has been with Freedom
> House since 12/2000 and worked in MET (mobile crisis) since 2018.
> This employee was written up in October and again in January for
> basically not following through with appointments, responding to
> supervisor, returning calls etc. Documentation was not a main issue
> addressed in these write ups. Johnnie continues to have issues and
> since April has failed to do assessments on approximately 20 clients
> even though he knows protocol is to do assessments on at least 75%
> of client calls. He received training on all protocols. This is poor
> client care and could certainly create liability issues due to lack of
> documentation.
>
> The recommendation of the direct supervisor and Regional Director is
> termination. This can be supported by agency procedure as it does
> not require specific disciplinary process (see pages 20-21 of Personnel
> Policies attached). Also, I spoke with Kim Anthony-Byng, Daymark
> employee who was over FH MET team for about 1 year. Kim
> confirms all the same issues that current supervisor is seeing. Kim
> said that she had to stay on top of him all the time to get him to go
> out to see clients and that she had problems with his failure to do
> assessments. Kim states that it was his normal process not to do
> assessments and he always had excuse as to why he did not do one.
> I do need to point out that employee's supervisor worked directly with
> him for about 30 days and employee did his job including
> assessments. However, when direct accountability stopped, he went
> back to his old habits.
>
> I have some concern of potential issues for the agency due to
> employee's tenure, race, age and fact that employee's documentation
> issue has not been addressed in writing with plan of correction put in
> place; but, I think the potential liability for client care outweighs risk
> to agency. Therefore, I agree with termination recommendation. . . .

(Email from Shoaf to Sumpter and Miller [Doc. #57-13].) Miller then spoke with

Sumpter, and they believed termination was appropriate "because of the potential

liability to client care and the agency." (Dep. of Cathy Shoaf 75:8-16 (Mar. 28, 2022) [Doc. #41-5].)  Webb was terminated on May 26, 2020.

He brought suit alleging both Defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay overtime and straight time wages and retaliating against him, N.C. Gen. Stat. § 95-25.6 of the North Carolina Wage and Hour Act ("NCWHA") by failing to pay all promised wages on the regular payday and accrued vacation and sick leave as of his termination date ("Payday claim"), and the FMLA by interfering with his rights and retaliating against him.  Webb also alleges that Freedom House violated the North Carolina Retaliatory Employment Discrimination Act ("REDA") and wrongfully discharged him.

Freedom House moves for partial summary judgment on the Payday claim, FMLA interference claim, and all four retaliation claims.  Webb moves for summary judgment on all claims.

## II.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex

21

Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[7]).  The

"mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a reasonable

jury, based on the evidence, could find in favor of the non-moving party. Id. at

248.  The materiality of a fact depends on whether the existence of the fact could

cause a jury to reach different outcomes. Id.  The court cannot weigh the

evidence, by failing to credit contradictory evidence, or make credibility

determinations. Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651 (4th

Cir. 2018).

A.

Because Freedom House's motion is dispositive of a portion of Webb's

motion, it is addressed first.

1.

Webb contends that Freedom House failed to pay him all of his promised

wages in violation of N.C. Gen. Stat. § 95-25.6.  Freedom House argues that there

is no real distinction between this Payday claim and Webb's FLSA claim because

the Payday claim is nothing more than "overtime claims in disguise," seeks

"disputed wages, rather than merely undisputed accrued wages," and is not

---

[7] Rule 56(c) was amended effective December 1, 2010, but the substance of the
rule did not change.

supported by any facts "unique" from those supporting his FLSA claim. According to Freedom House, the "sole difference" between the Payday and FLSA claims "is [Webb's] attempt to recover sick pay under the NCWHA" but because Freedom House did not have a policy of paying out sick time upon separation, Webb is not entitled to receive it. (Freedom House's Br. in Supp. of Mot. for Partial Summ. J. ("Freedom House's Br. in Supp.") at 14-16 [Doc. #55].)

Webb counters that "the NCWHA invokes fundamental requirements that are imposed on <u>all</u> North Carolina employers," including the obligation to pay employees "all wages and tips accruing to the employee on the regular payday." Section 95-25.22(a), Webb argues, "provides a private cause of action under § 95-6 for recovery of <u>all</u> unpaid accrued promised wages, regardless of any claim for minimum wage or overtime wages." Freedom House "<u>promised</u> [him] hourly wages based on the hours worked each shift, as documented in [its] PrimePay system, and paystubs" and was, thus, "<u>required</u> to compensate [him] consistent with such promise, which [Freedom House] failed to do." (Pl.'s Resp. in Opp'n to Def. Freedom House's Partial Mot. for Summ. J. ("Pl.'s Resp. in Opp'n") at 22-27 [Doc. #62].)

N.C. Gen. Stat. § 95-25.6 requires "[e]very employer [to] pay every employee all wages and tips accruing to the employee on the regular payday." Often examined with N.C. Gen. Stat. § 95-25.6 is N.C. Gen. Stat. § 95-25.14 which exempts FLSA-covered enterprises from NCWHA's minimum wage (§ 95-25.3) and overtime (§ 95-25.4) provisions.

23

> The FLSA preempts overtime claims 'to the extent [the] cause of action seeks compensation under state law for overtime pay mandated by the FLSA or alleges that [the] plaintiff[] received less than the federal minimum wage . . . .' By contrast, the payday claim is designed to protect employees who did not receive the pay owed to them, independent of the overtime rate required by the FLSA.

Torres-Tinajero v. Alpha Constr. of the Triad, Inc., No. 1:18cv160, 2020 WL 5411748, at *4 (M.D.N.C. Sept. 9, 2020) cited in Mebane v. GKN Driveline North America, Inc., 499 F. Supp. 3d 220, 228 (M.D.N.C. 2020); see also Luna-Reyes v. RFI Constr., LLC, 109 F. Supp. 3d 744, 752-53 (M.D.N.C. 2015) (denying a motion to dismiss the plaintiff's payday claim, in support of which he alleged "that he was paid the same hourly rate for all hours he worked, even when they exceeded forty per week" and "that he was not paid at all for at least one week," because "[t]he FLSA does not preempt [payday] claims"); Bigelow v. Sassafras Grove Baptist Church, 786 S.E.2d 358, 363 (N.C. Ct. App. 2016) (finding "allegations that the contractually promised 'salary' constituted wages [under the NCWHA], along with [the] allegation that defendant wrongfully failed to pay that salary, sufficiently alleges a claim under [§ 95-25.6]").

Here, Webb's Payday claim is distinct from his FLSA claim. He argues that Freedom House has not paid him his promised, accrued wages, evidenced by comparing the PrimePay timesheets with his paystubs. (Sampling of PrimePay timesheets [Doc. #53-8]; Sampling of paystubs [Doc. #53-9].) The timesheets report the hours worked each day, the straight-time hours, and the overtime hours. They also reflect the pay rate ($18 per hour) and the earned wages ($18 for each

24

regular-pay hour and $27 for each overtime hour).  On the other hand, the paystubs show no compensated overtime wages. (Compare, e.g., Sampling of PrimePay timesheets for January 9 through 25 pay period (FH00484-FH000486) with Sampling of paystubs for January 9 through 25 pay period (FH000382).)  A reasonable jury could find that Freedom House promised to pay Webb the earned wages reported on his timesheets but failed to pay him for all of those earned wages.  Summary judgment in Freedom House's favor on the Payday claim is denied.

2.

Webb alleges that Freedom House failed to provide him the requisite notice of his FMLA rights and, thus, interfered with those rights.  Freedom House argues that the claim fails because Webb was not denied any benefit, did not request additional time off after returning to work, and returned to work knowing that he had additional leave available.  Thus, he has not shown that he was prejudiced. (Freedom House's Br. in Supp. at 24-25.)  Webb responds that the evidence establishes he was prejudiced. (Webb's Resp. in Opp'n at 35-36.)

The FMLA entitles eligible employees to "a total of 12 workweeks of leave during any 12-month period" to, as is relevant here, care for a son who has a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). See 29 U.S.C. § 2611(11) (defining "serious health condition").  When an employee returns from leave, he is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced; or [] to be restored to an equivalent

25

position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).  An employer is prohibited from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1).

Employers are required to provide each eligible employee with, as is relevant here, what is referred to as the "rights and responsibilities notice." 29 C.F.R. § 825.300(c).

> The purpose of the employer notice requirements "is to ensure that employers allow their employees to make informed decisions about leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004).  That purpose is thwarted when "the employee has not received the statutory benefit of taking necessary leave with the reassurance that h[is] employment, under proscribed conditions, will be waiting for h[im] when []he is able to return to work." Id.  Thus, "[a]ny violations of the Act or of these regulations constitute interfering with" the exercise of an employee's rights. 29 C.F.R. § 825.220(b).

Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 301 (4th Cir. 2016) (alterations by Vannoy).  However, an FMLA notice violation is only actionable if the employee was prejudiced by the failure to give him the requisite notice. Id. at 301-02 (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).

"Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently." Id. at 302.  For example, in Vannoy, the employee's thirty-day medical leave request was approved and he was told of his FMLA eligibility; however, he alleged that he was not notified of his job protection

26

rights under the FMLA. Id. at 299. So just a few days into the thirty-day leave period, he returned to work out of fear of losing his job. Id. He testified that it "would have made a huge difference" had he known of his job protection rights; he would have known he could have received help, gone to treatment, and returned to work. Id. at 303. His family testified to the same. Id. The Fourth Circuit Court of Appeals explained that "[t]he fact that [the employer] approved Vannoy's FMLA leave does not automatically foreclose his interference claim." Id. at 303 n.5. "Vannoy's unconditional testimony is that he would have structured his leave differently – that he would have taken an extended period of medical leave so that he could go to inpatient treatment – had he known of his right to be reinstated." That is sufficient to survive summary judgment. Id. at 302-303.

Similarly in Hannah P. v. Coats, 916 F.3d 327, 335 (4th Cir. 2019), the plaintiff's request for four weeks of medical leave was approved but she was required to use annual leave for nearly all of the leave period. In response to her employer's motion for summary judgment, the plaintiff submitted a declaration in which she stated, "Had I known I could have chosen to take sick leave for the entire period, I would have elected to do so" because "[u]nlike annual leave, sick leave is not paid out at the end of an employee's service, resulting in a loss of a benefit worth at least $20,000." Id. at 347. This evidence of prejudice was sufficient to survive summary judgment. Id.

Here, the only dispute as to Webb's FMLA interference claim is whether he was prejudiced by Freedom House's failure to provide him the requisite notice.

27

Although he was permitted to use his accrued leave to care for his hospitalized son, after two weeks he returned to work a weekend shift at Burkert's request and, after another three weeks with his son, returned to work because he only had two weeks of leave remaining and wanted to save it in case something happened with his son. When asked at his deposition if he "would have taken some of the extra time to spend with [his] son" if he had been advised that he "could take up to 12 weeks of unpaid leave", Webb responded, "Yes. I would have used some leave time." This evidence creates a genuine dispute of material fact as to whether Webb was prejudiced by Freedom House's failure to provide him notice of his rights and responsibilities under the FMLA. Summary judgment in favor of Freedom House is denied.

3.

Webb also alleges that his termination was in retaliation for inquiring into his compensation (in violation of the FLSA) and for taking time to care for his son (in violation of the FMLA). Freedom House argues that Webb has not made a prima facie case or presented evidence of pretext in support of either claim. (Freedom House's Br. in Supp. at 17-24.) But Webb argues that, not only does the evidence support a prima facie case for both claims, but he has also shown that Freedom House's asserted reasons for terminating him are pretextual. (Pl.'s Resp. in Opp'n at 28-34, 36-37.)

The FLSA and FMLA prohibit an employer from discharging or otherwise discriminating against an employee because the employee opposes an unlawful

28

practice under the FLSA or FMLA. 29 U.S.C. § 215(a)(3) (FLSA); 29 U.S.C. § 2615(a)(2)[8] (FMLA); see also Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008) (quoting Mitchell v. Robert de Mario Jewelry, Inc., 361 U.S. 288, 292 (1960)) ("The provision therefore effectuates enforcement of the [FLSA's] substantive provisions by removing 'fear of economic retaliation' so that employees need not 'quietly . . . accept substandard conditions.'").

Webb and Freedom House both use the burden-shifting analysis and agree that these retaliation claims require Webb to show that he suffered an adverse employment action causally connected to his protected activity, and, if Freedom House offers a non-discriminatory explanation for the adverse employment action, he must establish that the explanation is a pretext for retaliation. See Darveau, 515 F.3d at 340 (FLSA); Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (FMLA).  An employer's proffered explanation is pretextual when it "is unworthy of credence to the extent that it . . . permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 723 (4th Cir. 2002).  For example, "a factfinder may infer that an employer's post-hoc rationale is not a legitimate explanation for an adverse employment decision." Smith v. CSRA, 12 F.4th 396, 421 (4th Cir. 2021) (citing EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th

---

[8] See Fry v. Rand Constr. Corp., 964 F.3d 239, 245-46 (4th Cir. 2020), for a discussion of circuit precedent and Department of Labor regulations on the application of § 2615(a)(2) to claims for FMLA retaliation for taking leave.

Cir. 2001)).  Similarly, a factfinder may find pretext when there are inconsistent

justifications and a "total lack of documentary evidence" of poor performance.

Jacobs v. N.C. Admin. Office of Cts., 780 F.3d 562, 575 (4th Cir. 2015). See also

Haynes v. Waste Connections, Inc., 922 F.3d 219, 225-26 (4th Cir. 2019)

(recognizing that "an employer is certainly permitted to expand on its original

reason for a termination" but evidence of "substantial changes" "permits an

inference of pretext"); Sears Roebuck & Co., 852-53 (finding that the employer's

offer of "different justifications at different times for" the adverse employment

action "is, in and of itself, probative of pretext").  On the other hand, a "plaintiff

cannot seek to expose [a non-discriminatory] rationale as pretextual by focusing on

minor discrepancies that do not cast doubt on the explanation's validity, or by

raising points that are wholly irrelevant to it." Holland v. Washington Homes, Inc.,

487 F.3d 208, 216 (4th Cir. 2007) (noting that "[t]he former would not create a

'genuine' dispute, and the latter would fail to be 'material'").

    Even if Webb could establish a prima facie case for both claims, he has not

shown sufficient evidence from which a reasonable jury could find pretext.  Webb

describes Freedom House's reasons for terminating him as "disputed, inconsistent,

and unsupported by the evidence."  He argues that "[n]ot withstanding such post-

hoc justifications, [his] twenty-year tenure performing the same or similar work

successfully evidences pretext." (Pl.'s Resp. in Opp'n at 33.)

    There is no dispute that Webb received positive performance evaluations as

a healthcare counselor and peer support specialist, but those "evaluations merely

establish that at one point [Webb] was meeting expectations; they do not, however, suffice to show that the later poor evaluations [or termination] [occurred] as a matter of . . . discrimination." Hill v. Belk Stores Servs., Inc., No. 3:06-CV-398, 2009 WL 2426314, at *4 (W.D.N.C. Aug. 5, 2009).

Nothing about the reasons supporting Webb's termination can be described as post-hoc. Nor can they be considered inconsistent and certainly not substantially so. Webb was continuously notified of his performance issues as early as his probationary evaluation in June 2019 when, despite an overall positive review, his documentation during his shifts and assessments at the end of his shifts needed improvement. Webb's performance as a full-time MCC – poor communication, attitude with mobile crisis dispatch, late work affecting others' work, lack of required clinical supervision, failure to do required assessments, and evasion of calls, among other issues – potentially jeopardized Burkert's license, Freedom House, and its clients including the most vulnerable populations served.

Webb disagrees and offers his testimony and declarations from colleagues, Keith Haynie (who did not supervise Webb, did not work in the MET, and did not offer evidence of his personal knowledge of his averments) and Clayvon Everett (who had not supervised Webb since 2008), (Decl. of Keith W. Haynie, Sr. (June 1, 2022) [Doc. #53-5]; Decl. of Clayvon Everett (June 1, 2022) [Doc. #53-6]), disputing Freedom House's assessment. "But such disagreement does not prove that [Freedom House's] decision to fire [Webb] for [continued poor performance placing the agency and its clients at risk] was 'dishonest or not the real reason for

31

[his] termination.'" Laing v. Fed. Express Corp., 703 F.3d 713, 722 (4th Cir. 2013) ("[I]n attempting to defend the conduct that led to her termination, all Laing has proven is the unexceptional fact that she disagrees with the outcome of FedEx's investigation."). "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of Hawkins' co-workers as to the quality of her work are similarly [as] 'close to irrelevant'" as her own.) Webb has not met his burden to show that Freedom House's termination of him was in retaliation in violation of the FLSA or the FMLA.

### 4.

Because Webb has failed to show retaliation in violation of the FLSA, his REDA claim fails, as well. See N.C. Gen. Stat. § 95-241 (REDA); Wiley v. United Parcel Serv., 102 F. Supp. 2d 643, 650 (M.D.N.C.) (applying the burden-shifting scheme to a REDA claim). Webb's wrongful discharge claim depends on the REDA claim; therefore, it, too must be dismissed.

### 5.

In sum, Freedom House's motion for partial summary judgment is granted as to the retaliation claims in violation of the FLSA, FMLA, REDA and North Carolina public policy (wrongful discharge). The motion is otherwise denied.

### B.

Webb moves for summary judgment on all of his claims against each Defendant. Because summary judgment has been granted in Freedom House's

32

favor on Webb's retaliation claims, Webb's motion as to those claims against Freedom House is denied. Webb also alleges his FLSA and FMLA retaliation claims (but not REDA or wrongful discharge) against Daymark. For the reasons explained in § A, Webb's motion as to the FLSA and FMLA retaliation claims against Daymark is denied (and the claims remain live against Daymark).

1.

First, Webb argues that Daymark and Freedom House were his joint employers for purposes of his FLSA and NCWHA claims. (Pls.' Mem. of Law in Supp. of His Mot. for Summ. J. ("Pl.'s Mem. in Supp.") at 13-17 [Doc. #53].) Daymark responds that genuine disputes of material fact foreclose summary judgment. (Def. Daymark Recovery Servs., Inc.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Daymark's Opp'n") at 8-12 [Doc. #63].)

Indeed, "joint employment exists when 'the facts establish . . . that employment by one employer is not completely disassociated from employment by the other employer[].'" Salinas v. Commercial Interiors, Inc., 848 F.3d 125, 134 (4th Cir. 2017) (quoting 29 C.F.R. § 791.2(a)). The doctrine treats the employment "as 'one employment' for purposes of determining compliance with the FLSA's wage and hour requirements and [] holds joint employers jointly and severally liable for any violations of the FLSA." Id. Relevant factors to consider when determining if the facts support joint employment include the allocation of power to control the worker, to hire or fire the worker, and to modify the terms of the conditions of employment; the "permanency and duration of the relationship

33

between the putative joint employers;" the control one putative joint employer has over the other; where the work is performed; and the allocation of responsibility over payroll, insurance, taxes, and providing the facilities and tools necessary to complete the work. Id. at 141-42.

While there appears to be no dispute that Freedom House employed Webb, the issue is whether Daymark can also be said to have employed him. However, it cannot be determined as a matter of law that Daymark and Freedom House were Webb's joint employers for purposes of the FLSA (or the NCWHA). Deposition testimony, emails, and other evidence create genuine disputes of material fact. For example, Webb's supervisor was his Freedom House Team Lead, but she reported to Daymark's Director of the MET, Anthony-Byng, and then to Freedom House's Griffin-Dolciney. When Webb needed to miss work to attend to his son, he not only called Burkert, but also Anthony-Byng. Anthony-Byng (and later Griffin-Dolciney), Burkert, and Williams were in regular contact about Webb's work performance. Williams sought guidance on Webb's termination from Daymark's Director of Human Resources Shoaf who, in turn, sought direction from Freedom House's interim leadership Sumpter and Miller. This is just a sampling of the evidence that must be assessed by a jury to determine if Daymark and Freedom House jointly employed Webb.

2.

Webb claims that Defendants failed to pay him all of his straight time and overtime wages in violation of the FLSA and failed to pay him all of his promised

34

wages on his regular payday. (Pl.'s Mem. in Supp. at 17-21.) Daymark and

Freedom House disagree and contend that genuine disputes of material fact exist.

(Daymark's Opp'n at 12-14; Freedom House's Br. in Opp'n to Pl.'s Mot. for Summ.

J. ("Freedom House's Opp'n") at 12-19 [Doc. #64].)

Under federal law, for "a workweek longer than forty hours", an employee

must be compensated for the excess hours "at a rate not less than one and one-

half times the regular rate." 29 U.S.C. § 207(a)(1). And North Carolina requires all

promised pay – straight time and overtime – to be paid on the regular payday. N.C.

Gen. Stat. § 95-25.6. It cannot be determined as a matter of law that Defendants

violated the FLSA and NCWHA. For example, the depositions of Webb and

Williams, Webb's offer letter, the sampling of his timesheets, and the sampling of

his paystubs show genuine disputes of material facts that must be resolved by a

jury.

3.

Although summary judgment was denied for Freedom House on Webb's

FMLA interference claim because there is evidence from which a reasonable jury

could find that Webb was prejudiced by Freedom House's failure to provide him

notice, it does not follow that a jury must so find. Therefore, Webb's motion for

summary judgment on this claim is denied.

4.

In sum, Webb's motion for summary judgment on all claims is denied.

35

III.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY

ORDERED that Plaintiff Johnnie Webb, Jr.'s Motion for Summary Judgment [Doc.

#52] is DENIED and that Defendant Freedom House Recovery Center, Inc.'s Motion

for Partial Summary Judgment [Doc. #54] is GRANTED IN PART as to Webb's

claims for FLSA retaliation, FMLA retaliation, REDA violation, and wrongful

discharge but is OTHERWISE DENIED.

This the 20th day of December, 2022.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

36