IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOHNNIE WEBB, JR.,            )
                             )
            Plaintiff,       )
                             )
        v.                   )        1:21cv424
                             )
DAYMARK RECOVERY SERVICES,    )
INC.; and FREEDOM HOUSE       )
RECOVERY CENTER, INC.,        )
                             )
            Defendants.      )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is the motion of Defendant Daymark Recovery Services, Inc. ("Daymark") for partial summary judgment. (Doc. 130.) Plaintiff Johnnie Webb, Jr., opposes the motion. (Doc. 133.) Webb also moves for reconsideration of the court's prior grant of partial summary judgment for co-Defendant Freedom House Recovery Center, Inc. ("Freedom House") (Doc. 136), which both Defendants oppose (Docs. 142, 143). For the reasons set forth below, Daymark's motion for partial summary judgment will be granted and Webb's motion for reconsideration will be denied.

I.   **BACKGROUND**

The facts, viewed in the light most favorable to the non-moving party, are set out in the court's December 20, 2022 memorandum opinion and order granting Freedom House's motion for partial summary judgment (Doc. 116) and are repeated here and

supplemented as appropriate based on the current record applicable to each motion.

Webb worked for Defendant Freedom House, which provides mental health and addiction services, from 1991 to 1997, and again from about 2000 until May 2020. (See Doc. 53-2 at 26.) Starting in 2010, Webb worked additional shifts part-time with Freedom House's Mobile Crisis Clinic ("MCC"). (Doc. 53 at 10 (citing Doc. 23 ¶ 48, Doc. 41-6 at 23-24).) Between 2002 and 2018, he received at least five performance evaluations that were generally positive, including notes that he was a reliable and consistent employee. (Doc. 53-4 at 5-20.)

In July 2018, Freedom House and Daymark entered into affiliation agreements that led to Daymark's board of directors becoming the "ruling board" and Freedom House's board, along with that of another company, Insight Human Services, remaining as an "advisory" group. (Doc. 41-10 at 6-7; see Doc. 44-5 at 17-18.) The three boards retained their "name, mission, region, [and] independence" but were to report to the Daymark board and management team. (Doc. 41-10 at 6-7.) Daymark assumed control over Freedom House's Mobile Crisis Team (Doc. 56-3 ¶¶ 5-6), which Daymark refers to as the "Mobile Engagement Team" (Doc. 116 at 3 (citing Doc. 63-2 ¶¶ 3-4)). Daymark's Director of its Mobile Crisis Division, Kim Anthony-Byng, interviewed and hired Webb for a full-time evening position as a Mobile Crisis Clinician, which

2

was a part of Freedom House's Mobile Engagement Team, in December 2018. (See Doc. 53-14 at 2; Doc. 56-6.)  The Mobile Crisis Team "provides crisis intervention and prevention to individuals who request assistance for a crisis related to mental health, substance abuse, or development disability concerns."  (Doc. 56-3 ¶ 4.) Freedom House's client calls were routed through Daymark's dispatch center (Doc. 56-3 ¶ 5), and Daymark's Director of Mobile Crisis Division oversaw Daymark's command center and Freedom House's Mobile Engagement Team (Doc. 63-2 ¶¶ 3-4).  This was to ensure Freedom House complied with applicable standards.  (Doc. 63-2 ¶ 4.)  Freedom House's Mobile Crisis Clinicians reported to a Freedom House team lead, and the Team Lead reported to Daymark's Director of Mobile Crisis Division until January 2020 when Freedom House's Clinical Director took over supervision of the MET.  (Doc. 116 at 3 (citing Doc. 56-3 ¶ 6; Doc. 44-5 at 27-28.)

Freedom House, through the Mobile Engagement Team Lead, Detra Baker, sent Webb a letter dated December 26, 2018, offering him a "full-time, salaried, non-exempt position as a Mobile Crisis Clinician beginning January 2, 2019."  (Doc. 53-20 at 2.)  The letter stated he would work "Monday through Thursday on the 5:00 p.m. to 8:00 a.m. shift" and he would be put on a "three-month probation period," at the end of which "an evaluation of job performance will be conducted" by his direct supervisor, Baker. (Id.)  The letter advised Webb that he would then "either be given

3

regular agency status, three additional months of probation[,] or terminated." (Id.) Webb signed the offer letter on January 19, 2019. (Id.) In October 2018, before signing the Freedom House letter, Webb had previously signed a compliance letter regarding use of his electronic signature "during [his] employment with DAYMARK Recovery Services." (Doc. 53-18.) Also, Daymark supplied him a computer and cell phone (Doc. 41-6 at 32-33), and Anthony-Byng regularly conducted trainings with him and others (Doc. 44-6 at 48-49).

As a part-time clinician prior to 2019, Webb covered three counties (Orange, Durham, and Person), but his caseload increased to covering five counties (Orange, Durham, Person, Caswell, and Alamance) after becoming a full-time clinician. (Doc. 53-2 at 78-79; Doc. 53-6 ¶ 17.) As a member of the MCC, Webb was tasked with responding to "acute mental health breakdowns, drug or alcohol overdoes, suicidal individuals, or violence or threats to third parties," and therefore it was "critical that [Webb] act quickly" when receiving calls. (Doc. 56-3 ¶ 11.) He was responsible for "documenting interactions with clients and submitting information that would permit [Freedom House] to bill insurers for the services provided." (Id. ¶ 12.) "MCCs were required to enter notes for each call into Daymark's electronic system" and "to complete clinical assessments, for which [Freedom House] could receive reimbursement, and to document the client services into Freedom

4

House's system, called 'Alpha' or 'Wellsky'." (Id. ¶¶ 13, 14, 17; see also Doc. 53-2 at 80-81.) The information gathered in an assessment is used "to evaluate the individual's mental state and determine appropriate services." (Doc. 56-3 ¶ 15.)

As a part-time MCC member, Webb previously received a "flat rate [of $50] for [being] on-call" and an hourly rate of $18 when he responded to a call. (Doc. 44-6 at 28-30.) In his full-time position, however, his offer letter stated that the "position has a gross annual salary of $37,440.00" with a "semi-monthly gross salary" of "$1,560.00," which "includes a stipend for working the evening shift." (Doc. 53-20 at 2.) Webb also worked part-time shifts on Friday, Saturday, or Sunday. (Doc. 53-2 at 98-99.)

After Webb received his first paycheck as a full-time employee in early 2019, he believed he was not being paid for all hours he worked. (Doc. 53-2 at 93; see also Doc. 53 at 15 n.38 (comparing Doc. 53-8 with Doc. 53-9).) He first spoke with Anthony-Byng about his pay because she approved his salary. (Doc. 53-2 at 96.) He then spoke with Ivy Williams, Freedom House's Director of Human Resources, but she directed him back to Anthony-Byng because, she said, "Daymark is who's paying your salary." (Doc. 53-2 at 121-123, 125.) In March 2019, Webb and Anthony-Byng spoke again about the discrepancies between his timesheets and paycheck. (Doc. 53-2 at 125-126.) Webb says that Anthony-Byng gave him "a couple of choices" – he "could leave" or he "could go back to the position

5

[he] had before as a health care counselor." (Doc. 53-2 at 126.)
About a week later, Webb met with Williams and Anthony-Byng
together, and Anthony-Byng explained that he was being paid for
the hours of 5:00 p.m. to 3:00 a.m. "and that's how they were going
to pay [him]." (Doc. 53-2 at 128.) Webb "didn't have a response"
except that he would continue saving his time sheets. (Id.) Webb,
in addition to his scheduled shifts, took extra shifts and entered
that time into the pay system (known as "PrimePay") along with the
time he worked for his regular shifts until about July or August
2019. (Doc. 116 at 7.) Webb did not speak to Williams or Anthony-
Byng about his pay between April 2019 and January 2020. (Doc. 53-
2 at 130; see Doc. 41-6 at 64-65 (Webb noting that he spoke to
Anthony-Byng sometime in January 2019, "two weeks later," and then
"three months after the two week conversation.").)

     In June 2019, Webb received an overall positive performance
evaluation that stated he did not require any change to his job
description; his attendance/punctuality and professional
relationships were "excellent"; his customer support, task
performance, and professional development were "acceptable"; but
his documentation, including sending dispositions at the end of
each shift, "needs improvement." (Doc. 53-4 at 1-4.) The
dispositions were important because Daymark could not access
Freedom House's electronic medical records and clinicians needed
to complete dispositions and forward them to dispatch who could

determine how clients had been assisted and which clients needed further assistance. (See Doc. 41-4 at 60-62.) Around this same time, Webb was supervised by Byron Brooks, Ph.D., and was required to attend one-hour weekly individual meetings to develop the skills necessary to fulfill "12 Core Functions."[1] (Doc. 56-13.)

In July 2019, Webb's Team Lead changed from Baker to Burkert. (Doc. 56-3 ¶ 8.) The same month, Webb's son was seriously injured after being pushed out of a moving vehicle and remained in a hospital in Baltimore, Maryland. (Doc. 53-2 at 111-12.) Webb told Williams he needed eight weeks to stay with his son. (Doc. 53-2 at 116.) Webb was told to go care for his son and that Williams would take care of his leave. (Doc. 53-2 at 110-116.) He was, however, never advised of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. (Doc. 116 at 9-10 (citing Doc. 53-2 at 188); Doc. 53 at 16 (citing Doc. 44-6 at 123; see Doc. 44-4 at 58-59).) After Webb was with his son for two weeks, Trish Burkert, Webb's supervisor at Freedom House, told him to return to North Carolina to work. (Doc. 53-2 at 117-118.) Webb admits that these were "extra shifts that [he] signed up for," but says he "forgot" about them. (Doc. 53-2 at 118.) He returned to work for one week before leaving again for Maryland to stay

---

[1] Anthony-Byng, as Daymark's Mobile Engagement Director, signed Webb's June 2019 evaluation noting his issues with documentation. (Doc. 53-4 at 3-4.) In 2019, the Freedom House Mobile Crisis Clinicians reported to a Team Lead, who was employed by Freedom House, and the Team Lead reported to Anthony-Byng. (Doc. 56-3 ¶¶ 6-8.)

7

with his son. (See Doc. 53-2 at 118-20.) In total, Webb took five weeks of non-continuous leave from work. (See Doc. 53-2 at 118-20; see Doc. 44-6 at 123-24.) When Webb first returned to work around August 2020, no one acted negatively toward him and no one "did anything different" toward him. (Doc. 53-2 at 120-121.)

In October 2019, a team lead for Daymark informed Burkert, Webb's team lead at Freedom House, that dispatchers were complaining to her about Webb's attitude when he received a call for Person Memorial Hospital, noting that he would suck his teeth, take deep breaths, and make long sighs, among other things. (Doc. 116 at 10-11 (citing Doc. 56-9).) When Webb responded to the call, he failed to update the hospital with his arrival time. (Doc. 56-9.)

The following day, Burkert completed an "Employee Disciplinary Action Form" for Webb and noted that he had an "attitude with dispatch operators, asking who else is available to take calls" instead of him; that he did not return phone calls, texts, or emails with team leads; that he used poor communication with the program director and team lead; and that his late work made other clinicians' work late. (Doc. 53-23 at 3-4).) Webb acknowledges having had a meeting in September or October 2019 with Anthony-Byng and a Team Lead to discuss an issue with a dispatcher who repeatedly called him when he was attending to a client at an elementary school and he recalls signing "a piece of

8

paper." (Doc. 41-6 at 67-69.) At his deposition, Webb also acknowledged that he spoke to Burkert once "concerning calls coming into the crisis unit" when "they said I was talking back, being vocal to dispatchers." (Doc. 53-2 at 192-93.) Though Webb admits that it is his signature on the disciplinary form (Doc. 53-2 at 148), he states that he does not "remember that paper" (id.) and surmises that perhaps one of the Defendants attached his signature to the document (id. at 149), although he does not offer any evidence of this allegation. Webb denies having conversations with anyone regarding the problems enumerated in the October 2019 form (see Doc. 53-2 at 144-45) but concedes having had "one conversation about the e-mail system being down" and speaking with Burkert about "her having to resend e-mails to you to get a response" (Doc. 53-2 at 146). He also acknowledges that he was "instructed to return all phone calls, texts, and e-mails to the team lead program director and dispatch within 24 hours." (See Doc. 53-2 at 147-48.) Overall, though, he testified that no one ever had a conversation with him about any of the issues identified in the disciplinary action. (Doc. 41-6 at 69 (agreeing that no one from Daymark had disciplined him); Doc. 53-2 at 143-149, 192-193.)

Throughout October 2019, Burkert continued to have problems with Webb's dilatory communication and notified Williams and Anthony-Byng. (Doc. 56-10.)

9

In mid-January 2020, Burkert inquired about Dr. Brooks'
clinical supervision of Webb. (Doc. 53-28 at 4.) She learned
that Dr. Brooks had not seen Webb in months. (Id. at 3-4.) Dr.
Brooks' impression of his supervision of Webb was "that it was in
prep for CSAC" and he "saw it as a favor for the previous MET
supervisor." (Id. at 2-3.) After learning this, Anthony-Byng
supported a write-up of Webb, as did Williams, but Williams also
explained that Webb's responsibility to follow up with Dr. Brooks
may not have been made clear to him. Nevertheless, she noted that
they had "gone through this several times and Johnnie has been
here long enough to know that he needs to receive supervision which
has been documented on agency forms." (Doc. 53-28 at 2-3; Doc.
56-14.)

A few days after those discussions, on January 16, Burkert
emailed Webb to schedule a meeting to start his clinical
supervision "ASAP" because "it is a state requirement." (Doc. 56-
15.) A few days later, she emailed Webb (a second time) about
months' old care reviews that he had yet to complete and send to
Khara Saunders. (Doc. 57-2.)

On January 22, Burkert sent another email to Webb copying
Griffin-Dolciney (Freedom House's Clinical Director who would soon
take over the MET), Anthony-Byng, and Williams:

> Johnnie,
>
> I have not received a response from you about

10

supervision. I do not want to have to write you up, but if I do not get a response to the questions I posed in the email below AND if you do not connect with me about setting up weekly supervision, I will not hesitate to do so.

It is my understanding from Ivy that you are fully aware that you need supervision. Every day that goes by with you not doing supervision is another day that puts MET at risk if we get audited. As it stands, it has already been too long that you've been without supervision, so we are already at risk. I have asked more than once for you to meet with me about this. The first time you were supposed to call me after your doctor's appointment (the day of the staff meeting) and I never heard back from you, and the second time you asked to reschedule because your doctor wanted you to go home and rest, but then you never followed up with me; I also texted you on the 17th asking you to please respond to this email.

Johnnie, I need your response to this email, answering all of the questions I posed, and letting me know what time you can meet with me tomorrow afternoon to talk about starting supervision. If I do not receive a complete response from you by the end of tonight's shift, I will move forward with disciplinary action. And, know that part of your supervision with me is going to be talking about communicating via email and workplace professionalism.

(Doc. 56-15 at 1.)

That same day, Anthony-Byng sent an email to Burkert, Williams, and Griffin-Dolciney expressing her concerns about Webb:

Trish, Thank you for your email. Ivy and Heather, Johnnie has continued to be a problem over the last several months. It feels like we beg him to do his job and to work as he is supposed to. I have emailed him at least 5 times or so over last few months, encouraging him to stop putting needs no follow up on dispositions for clients who could use some follow up, but he never changes what he does, continuing to put needs no follow up as if my words mean nothing. I know it is a process, but just wanted you to know that he is just not

11

> appropriate for this level of service in my opinion. He
> lacks the sense of urgency that you need to do crisis
> work. I took Johnnie off of this email.

(Doc. 57-3 at 1.) As an example, Williams testified, residents from a Durham housing project were displaced to local hotels, and Alliance, the managed care organization for Durham, requested MCCs to come onsite and speak with residents to offer mental health services and assistance. (Doc. 44-6 at 129-130.) Burkert, Webb, and other clinicians responded. (Id.) All except Webb returned having made referrals for follow-up. (Id.; Doc. 56-3 ¶ 24.)

Williams, Burkert, Anthony-Byng, and Griffin-Dolciney continued discussing Webb's performance on January 22, 2020. Williams wrote that she and Burkert "met with [Webb] a few months back when she was about to write him up for failing to respond to her emails, he swore that he would be more diligent." (Doc. 62-4 at 2.) She found Webb's behavior to exhibit "Negligence, Failure to Follow Instructions [Written and Oral], and Insubordination." (Id.) Burkert replied that she "wrote [Webb] up" previously about his issues and that she believed Webb should be terminated if it was correct that he had only two weeks of supervisions forms from May 2019 to January 2020. (Id.)

Dr. Brooks told Griffin-Dolciney and Williams that Webb had called numerous times to cancel or reschedule saying he was busy or tired, and, until Webb "popped in" after he returned from Maryland to say he wanted to restart their sessions (which they

12

did not do), Dr. Brooks thought Webb was no longer with Freedom House. (Doc. 62-4; Doc. 56-14.) On January 28, Burkert emailed Webb again about the need to begin his clinical supervision and warned him that if he did not address the issue that week, she would remove him from the schedule until he was "re-engaged in supervision." (Doc. 53-24 at 3.) Webb testified that he recalled missing supervisory meetings only when he was in Maryland with his son, although he could not say that he went to all of his clinical supervision meetings in 2020. (Doc. 53-2 at 152-53.)

On January 30, Burkert once again emailed her MET staff, including Webb, about email responsiveness, their responsibility for maintaining both email accounts, their accountability for the information being sent, and to alert her if there were technology issues so she could address them. (Doc. 53-25.) In addition, Burkert reminded the staff of their job responsibilities and deadlines. (Doc. 53-25.)

On January 30, Burkert also completed another "Employee Disciplinary Action Form" as well as a "Performance Improvement Plan" for Webb. (Doc. 53-23 at 6-7.) The form states that Webb failed to return emails, as directed in the October 2019 form; missed 26 of 52 sessions for 2019 and did not communicate with his team lead about restarting supervision in 2020; and did not meet the minimum productivity requirement for January because he only completed three client assessments for the month. (Doc. 53-23 at

13

6.)  Webb admits his signature on the document (Doc. 53-2 at 149-50) but does not recall signing it, saying that he would know if he had done so (id. at 150-51).  Webb concedes, however, that he had a conversation in or around January 2020 about "failing to respond to e-mail communications as previously addressed in the October 2019 discipline."  (See Doc. 53-2 at 150-51.)  He also admits missing "some" of his required clinician appointments, as noted on the disciplinary form, but does not recall missing twenty-six.  (Id. at 152.)  Further, he states that even though his Daymark e-mail was always "fine," he did not recall receiving two emails from Burkert regarding his supervision and argues that he did not receive them because he "do[es]n't work that time of the day."  (See Doc. 53-2 at 158-161.)  Webb challenges the information on the January 30, 2020 form as inaccurate.  (See Doc. 53-2 at 150-56.)

Also sometime in January 2020, Webb asked Williams and Keith Haynie, the Outpatient Program Director for Freedom House, for information on how to obtain copies of his timesheets.  (Doc. 53-2 at 136-37.)  Williams provided copies of timesheets, but instead of his PrimePay timesheets (reflecting the hours Webb recorded in the computer), these timesheets were labeled "Freedom House" and did not include the same information as his PrimePay timesheets. Williams nevertheless told Webb that was "the paperwork that Freedom House had."  (See Doc. 53-2 at 130-134.)  Webb also spoke

14

with Williams about his timesheets sometime in February 2020. (Id. at 135.)  According to Webb, Williams told him that he would need to create an account in PrimePay to pull records for himself. (Doc. 53-2 at 135-36.)[2]  He then asked LeWandra Edwards, Freedom House's HR Assistant, for his timesheets, and she provided them for January 1, 2019, through February 2020.  (Doc. 53-2 at 139.) Williams testified that Webb did not complain to her about not being paid what he thought he was owed, and Williams does not recall anyone ever mentioning to her that Webb complained about his salary.  (Doc. 44-6 at 140-144.)

Burkert shadowed Webb throughout February 2020, and his productivity improved.  (See Doc. 57-4.)  At some point in February 2020, Anthony-Byng left her role as Director of Daymark's Mobile Crisis Division, although she remained employed by Daymark.  (Doc. 63-2 ¶¶ 2-3, 12.)

On April 2, however, Burkert emailed Webb about continued problems, noting, among other things: "ongoing issue[s] with [his]

---

[2] Webb's briefing has other characterizations that ultimately rely on inadmissible evidence.  For example, Webb cites Haynie's declaration, which purports to relay Williams' conversation with Webb with characterizations that Webb's request was met with "pushback," that Williams was "unhelpful," and that "HR had a very 'how dare you challenge us' reputation."  (Doc. 53-5 ¶¶ 23, 24.)  This is all inadmissible hearsay, is speculative, and lacks foundation.  Indeed, much of Haynie's declaration contains hearsay.  (E.g., id. ¶ 25 ("It is my understanding that Johnnie again requested his time records from HR . . . .").)  Webb also relies on Everett's declaration for the statement that "[t]o my recollection, she [Williams] gave him [Webb] a hard time about his complaint."  (Doc. 53-6 ¶ 22.)  Again, there is no foundation for Everett having personal knowledge of this otherwise hearsay statement.

communication;" his "recently [having] been on probation in part for not checking [his email];" their working together extensively to resolve his phone complications so he could receive emails; and her reminder that he recently signed a policy that he agreed to check his emails three times per shift but because he has "not been reading [his] emails, [he] was now days behind everyone else in making follow-up calls, which has resulted in mobile crisis losing money." (Doc. 53-27 at 2; Doc. 57-6 (same).) In this same email, Burkert told Webb that "by continuing to act against the plan that we set out in your last write-up, your job is at risk of being terminated." (Id.)

On April 3, Burkert sent another email to Webb in which she warned: "I need a response from you for EVERY email I send out, regardless as to whether I ask for one or not" and cautioned him that "[a]ny email that I do not get a response to will end with you being written up again." (Doc. 57-7 at 1.) Burkert noted her concern that Webb was not "fully aware of what's being asked of the team right now." (Id.) She concluded with the admonition, "I will not fight to keep you employed if you continue to shirk your responsibilities. This is truly unacceptable and cannot continue to happen without very significant consequences." (Id.)[3]

---

[3] Burkert also noted that because of the pandemic, they were conducting patient evaluations over the phone and over telehealth, and she directed Webb to review his old emails and set-up a program called "Doxy Clinic." (Doc. 57-7 at 1.)

16

By May, Burkert drafted another Employee Disciplinary Action Form in support of terminating Webb for failure to respond to all emails, poor response time for crises, and failure to assess a client over the phone who could not participate in telehealth, and she sent it to Williams and Heather Griffin-Dolciney,[4] a clinical director with Freedom House.  (See Docs. 57-8, 57-16, 44-5 at 13.) Williams corresponded with Cathy Shoaf, Daymark's Director of Human Resources, about Webb's past disciplinary forms for her review.  (Doc. 62-5.)

On May 6, 2020, Burkert exchanged emails with Webb, outlining his twelve outstanding "care reviews" and requested that he respond to her, Williams, and Griffin-Dolciney with an explanation.  (Doc. 57-9.)  Burkert also noted that she had "sent several emails" about completing assessments and that she and Webb spoke in March about completing care reviews in certain circumstances.  (Id.)  Further, another worker, Khara Saunders, could not complete requisite reports for the state of North Carolina because Webb did not complete his work timely.  (Id.)  Williams advised Burkert and Griffin-Dolciney on May 8 that they needed to do a "90-day Performance Improvement [Plan] identifying up to three essential

---

[4] Griffin-Dolciney states she had limited interactions with Webb while he was employed by the MCC but did know him.  (Doc. 44-5 at 26.)  While she never directly supervised Webb, Griffin-Dolciney supervised his last supervisor, Burkert, sometime in 2020 when Anthony-Byng was no longer Burkert's supervisor.  (Doc. 44-5 at 27-28.)  Griffin-Dolciney does not recall hearing of Webb's alleged wage complaints.  (Id. at 28.)

functions that must be done in a specific fashion and timeframe."
(Doc. 57-10.)  She concluded that "[f]ailure to do them as outlined
will result in his termination."  (Id.)

On May 20, Burkert sent an email to Williams and Griffin-
Dolciney with an attached productivity sheet that detailed Webb's
poor performance in April, and she requested a meeting to discuss
Webb's removal out of fear of that Webb was jeopardizing her
professional license. (Doc. 57-11.)  In relevant part, she wrote:

> Johnnie is not competent to be in this position.  He is
> finding ways to get around having to take calls and in
> doing so, is endangering the most at-risk client
> population we serve. . . . My take: financially, he is
> not even coming close to covering his own salary; his
> professional irresponsibility and incompetence adds
> considerably and consistently to my professional duties;
> in evading 18 out of 19 calls, he is clearly showing an
> inability to do the work; he failed to complete any
> clinical documentation in the electronic health record
> for 19 out of 20 calls; and, he lied in a client's
> clinical record about his arrival time, not by a few
> minutes but by an entire hour.  I am requesting a
> conversation with both of you to discuss Johnnie's
> immediate removal from MET, as I no longer feel capable
> of supervising him without significant risk of
> jeopardizing my own license.

(Id. at 1-2.)

Burkert emailed Webb about the lack of documentation for 19
of 20 calls in April.  (Doc. 56-3 at 16.)  For his part, Webb
disputed this characterization of his work and said he was "very
good at what [he] did, [he] answered each and every call that [he]
received," and he was "[v]ery confident" the data would show that
those 19 people "declined an assessment." (Doc. 53-2 at 163-167.)

Griffin-Dolciney approved of Burkert's reaching out to the clients from whom Webb had taken calls in April, and it was determined that he falsified documentation in Daymark's electronic system per the reports of some of the clients and/or their family members. (Doc. 56-3 ¶ 38; Doc. 62-6.) Having reviewed Burkert's notes from her calls, Griffin-Dolciney told Burkert and Williams, "[I]t seems he left vulnerable clients without needed support and potentially damaged the good name of the team by doing this." (Doc. 62-6 at 2.) She recommended considering a complaint to the appropriate certification body because of his unethical behavior. (Doc. 62-6 at 3.)

Burkert again expressed to Griffin-Dolciney and Williams that she did not want Webb on her team because "[h]e represents a known risk, and [she] [would] not continue to have him work under [her] license. It is far easier . . . to cover his shifts than continue to work as hard as [she had] been working to document his many professional failings." (Doc. 62-6 at 4.)

On May 26, 2020, Shoaf sent an email to Williams in which she outlined Webb's write-ups, failures to respond to supervisors, poor productivity performance, and her concerns about "poor client care." (Doc. 62-7 at 2.) Shoaf wrote that the "recommendation of the direct supervisor and Regional Director is termination," noting that "[t]his would be supported by agency procedure as it does not require specific disciplinary process." (Id.) Shoaf

contacted Anthony-Byng at Daymark, who at one time had supervised a Freedom House team, who confirmed many of the problems with Webb. (Doc. 57-13 at 1.) While Shoaf noted that she was concerned about Webb's "tenure, race, age and fact that [the] employee's documentation issue has not been specifically address (sic) at least not in writing with [a] plan of correction put in place" and that Webb's performance improved when he was directly supervised, she concluded that "when direct accountability stopped, he went back to his old habits." (Id.)

That same day, Shoaf emailed Duncan Sumpter (interim Freedom House Director) and Jay Miller (interim Freedom House CEO) as follows:

> We have an employee, Johnnie Webb, who has been with Freedom House since 12/2000 and worked in MET (mobile crisis) since 2018. This employee was written up in October and again in January for basically not following through with appointments, responding to supervisor, returning calls etc. Documentation was not a main issue addressed in these write ups. Johnnie continues to have issues and since April has failed to do assessments on approximately 20 clients even though he knows protocol is to do assessments on at least 75% of client calls. He received training on all protocols. This is poor client care and could certainly create liability issues due to lack of documentation.
>
> The recommendation of the direct supervisor and Regional Director is termination. This can be supported by agency procedure as it does not require specific disciplinary process (see pages 20-21 of Personnel Policies attached). Also, I spoke with Kim Anthony-Byng, Daymark employee who was over FH MET team for about 1 year. Kim confirms all the same issues that current supervisor is seeing. Kim said that she had to stay on top of him all the time to get him to go out to see

20

clients and that she had problems with his failure to do assessments. Kim states that it was his normal process not to do assessments and he always had excuse as to why he did not do one. I do need to point out that employee's supervisor worked directly with him for about 30 days and employee did his job including assessments. However, when direct accountability stopped, he went back to his old habits.

I have some concern of potential issues for the agency due to employee's tenure, race, age and fact that employee's documentation issue has not been addressed in writing with plan of correction put in place; but, I think the potential liability for client care outweighs risk to agency. Therefore, I agree with termination recommendation. . . .

(Doc. 41-11 at 2-3.)

Miller responded that he had spoken with Sumpter and they agreed on termination because of the "potential liability to client care and the agency." (Doc. 41-11 at 2.) Shortly thereafter, Shoaf emailed Williams that Webb was to be terminated and outlined the steps to do so, including informing Griffin-Dolciney and Burkert. (Id.) Webb's employment was terminated that same day. (Doc. 116 at 21; Doc. 53.)

While Webb alleges that he was retaliated against, he testified in his deposition that he never spoke with Shoaf or "anyone in Daymark's human resources department." (Doc. 41-6 at 66-67.) Moreover, he said, "No one from Daymark ever disciplined me." (Id. at 67.)

After his termination, Webb filed a charge against Defendants with the North Carolina Department of Labor for failure to pay

21

wages and for retaliation and, after no action, received a right-to-sue letter. (Doc. 19 ¶ 101.) Thereafter, he filed this lawsuit alleging violations of various federal and state laws. (See generally, Doc. 19.)

In his amended complaint, Webb alleges the following claims. Counts One and Two allege that both Defendants violated the FMLA and North Carolina Wage and Hour Act by failing to pay correct wages, including overtime. (Doc. 19 ¶¶ 103-133.) Count Three alleges that both Defendants violated the FMLA by interfering with and not informing Webb of his FMLA rights. (Id. at ¶¶ 134-147.) Count Four alleges that both Defendants violated the FMLA by retaliating against Webb for attempting to exercise his FMLA rights. (Id. ¶¶ 148-153.) Webb alleges that he was wrongfully discharged (id. ¶ 150) and that Defendants retaliated against him prior to termination by "harassing [him] for taking limited leave to help care for his son in the hospital [and] chastising [him] that Defendants need [him] to return to work" (id. ¶ 151). Count Five alleges that both Defendants violated the Fair Labor Standards Act by terminating him after he inquired about and reported Defendants' compensation practices. (Id. ¶¶ 154-160.) Count Six alleges that Freedom House violated North Carolina's Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-24 et seq., by treating Webb in a hostile manner and terminating him after he inquired into Freedom House's pay practices. (Id. ¶¶ 161-171.)

Finally, Count Seven alleges that Freedom House violated North Carolina public policy by terminating Webb. (Id. ¶¶ 172-179.)

On June 6, 2022, Webb moved for summary judgment against both Defendants on all claims (Doc. 52), and Freedom House moved for summary judgment against Webb (Doc. 54). Daymark did not move for summary judgment.

On December 20, 2022, Judge N. Carlton Tilley, Jr., issued a 36-page memorandum opinion and order denying Webb's motion for summary judgment as to all claims but granting Freedom House's motion for summary judgment as to Webb's claims of FLSA retaliation, FMLA retaliation, REDA violations, and wrongful discharge. (Doc. 116 at 36.) The court found that even if Webb could make out a prima facie case for retaliation, he proffered insufficient evidence from which a jury could reasonably find that Freedom House's proffered explanation for his termination was pretextual. (Id. at 31-32.) The court noted that Webb was notified continuously about his performance issues as early as June 2019 and that they were numerous and prolonged. (Id.)

The remaining claims against Freedom House and Daymark were thus set for trial during the January 2023 civil term of court, and the case was re-assigned to the undersigned who was to preside over that trial term. (Doc. 84.) A final pretrial conference was held on January 3, 2023, at which time the court inquired as to whether the retaliation claims against Daymark should survive

23

given the court's summary judgment decision as to Webb's parallel claims against Freedom House. Following discussion with counsel, the court re-opened the deadline for Daymark to move for summary judgment. (Doc. 132 at 13-14.)

Daymark now moves for partial summary judgment as to the retaliation claims against it (Doc. 130), and Webb moves for reconsideration of Judge Tilley's grant of the partial summary judgment in favor of Freedom House based on purported newly-discovered evidence (Doc. 136).

## II. ANALYSIS

Webb's motion for reconsideration[5] will be considered first, followed by Daymark's motion for summary judgment.

### A. Motion for Reconsideration

"Where a district court issues an interlocutory order such as one for partial summary judgment 'that adjudicates fewer than all of the claims,' the court retains discretion to revise such order 'at any time before the entry of a judgment adjudicating all the claims.'" Carlson v. Boston Scientific Corporation, 856 F.3d 320, 325 (4th Cir. 2017) (citing Fed. R. Civ. P. 54(b)). However, when compared to final judgments pursuant to Federal Rule of Civil Procedure 59(e), the approach for Rule 54(b) "involves broader

---

[5] Webb initially moved for reconsideration on January 24, 2023 (Doc. 134) but filed an "Emergency AMENDED Motion for Reconsideration" (Doc. 136) thereafter, which the court considers.

flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light." Id. (citing Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003); Cobell v. Jewell, 802 F.3d 12, 25-26 (D.C. Cir. 2015)).

The Fourth Circuit, as have other circuits, cautions that when one judge enters an order, a reviewing judge "should be hesitant to overrule the earlier determination." Id. (citing Harrell v. DCS Equip. Leasing Corp., 951 F.2d 1453, 1460 n.24 (5th Cir. 1992)). Revisions of interlocutory rulings pursuant to Rule 54(b) should be construed similarly to the "law of the case" doctrine. Carlson, 856 F.3d at 325. Under the law of the case doctrine, "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Id. (collecting cases.) To that end, there are generally three limited circumstances under which a court may revise interlocutory orders: (1) new evidence not previously available, (2) a change in applicable law, or (3) clear error that results in "manifest injustice." See id. "'A motion to reconsider is not a license to . . . present new evidence' that was previously available to the movant." Carrero v. Farrelly, 310 F. Supp. 3d 581, 584 (D. Md. 2018) (citations omitted).

Here, Webb's motion for reconsideration rests on a contention that he has discovered new evidence not previously available to

25

him that would change the outcome of the case. (Doc. 137 at 12.)
A party moving for reconsideration on the basis of newly discovered
evidence must show the following:

> (1) the evidence is newly discovered since the judgment
> was entered; (2) due diligence on the part of the movant
> to discover the new evidence has been exercised; (3) the
> evidence is not merely cumulative or impeaching; (4) the
> evidence is material; and (5) the evidence is such that
> is likely to produce a new outcome if the case were
> retried.

Slavin v. Imperial Parking, Civ. Case No.: PWG-16-2511, 2018 WL
337758, *4 (D. Md. Jan. 9, 2018) (quoting Boryan v. United States,
884 F.2d 767, 771 (4th Cir. 1989) (other citations omitted)).

Webb proffers two forms of evidence that he contends are newly
discovered and support his motion for reconsideration. (Doc. 137
at 13-14.) First, he offers declarations from Michael Bridges,
Christy Jay, and Renita Harris. (Id. at 14; Docs. 133-2, 133-3,
133-5.) Second, he offers evidence of prior litigation and
investigations against Freedom House and Daymark involving persons
other than himself. (Doc. 137 at 13-14; Docs. 133-7, 133-8, 133-
9, 133-10.)

As to the witness declarations, Jay's declaration states that
she began working for Freedom House in 2014 and was eventually
offered a full-time position on the Mobile Engagement Team. (Doc.
133-3 ¶ 1.) She discusses the "merger" of Freedom House and
Daymark, her salary negotiations leading up to her job with the
MCC, and her history with the company. (Id. ¶¶ 2-11.) She contends

26

that after the combination with Daymark, job duties became more onerous and confusing, and at times she was concerned that Daymark asked her to violate HIPAA regulations. (See id. ¶¶ 12-19.) She also contends that since Webb filed this lawsuit, Freedom House and Daymark have made changes regarding pay classifications, supplemental pay notifications, and payment for overtime. (See id. ¶¶ 30-31.) She states her belief that Webb's lawsuit "made Daymark and Freedom House realize they were violating the law" and that it is her "duty to provide information regarding [her] employment with Defendants, if it in anyway, [sic] assists Johnnie [Webb] recover what he is entitled to under the law." (Id. ¶ 34.) Importantly, Jay states that she was a coworker of Webb's, that Webb made complaints about his wages, and that Webb was "extremely committed" to his job, a fact she claims to know because she has previously read Webb's assessments. (Id. ¶¶ 35, 38.)

Harris' declaration is much of the same. Harris states that she worked with Webb at the MCC and that after the Defendants' affiliation, workflow became confusing and documentation policies changed. (Doc. 133-5 ¶¶ 1-18.) Further, she states that Webb was "an extremely thorough clinician" whom she never "knew any client to complain about" and was a reliable coworker who was regularly available. (Id. ¶¶ 30, 31.) Harris recalls Webb complaining to her and other MCC members about his pay. (Id. ¶¶ 32-33.) According

27

to Harris, she eventually went to the "Department of Labor"[6] about pay issues but declined to follow up out of concern for her job if she reported either Freedom House or Daymark. (Id. ¶¶ 34-35.) She was "surprised" to hear that Webb had been terminated, and she offers her belief that Webb was terminated because of his complaints regarding unpaid wages. (Id. ¶¶ 38-41.)

Bridges states in his declaration that he was a supervisor at Freedom House from 2013 to 2018. (Doc. 133-2 ¶ 1.) He supervised Webb when he worked in the MCC in 2017, was impressed with him, and found him to be "thorough, committed, empathetic and diligent." (See generally, id.)

Webb contends that the declarations contain newly discovered information since the judgment was entered because he filed them on January 24, 2023, "several weeks *after* the Court's December 20, 2022" decision. (Doc. 137 at 14.) This evidence was unavailable, Webb contends, because Jay and Harris were reluctant to testify previously out of fear of retaliation. (Doc. 137 at 16-17; Doc. 145 at 7.) Webb argues that such "fears of reprisal [are] a valid reason for why evidence was not discovered previously." (Doc. 137 at 15-17; Doc. 145 at 7 (citing Weathers v. Univ. of North Carolina at Chapel Hill, No. 1:12cv1059, 2014 WL 198216, at *3 (M.D.N.C. Jan. 15, 2014); Maylie v. Nat'l Passenger R. Corp., CIV. No. 81-

---

[6] It is unclear whether she means the state or federal agency.

1964, 1989 WL 153948, at *3-4 (E.D. Penn. Dec. 14, 1989)).) In
support, Webb cites Harris' declaration where she states that she
was concerned about losing her job if she complained about
Defendants' pay practices and that she "personally decided to reach
out to the Department of Labor in the past because she was
concerned about the compensation practices." (Doc. 137 at 18
(citing Doc. 133-5 ¶¶ 34-36).) Webb argues Bridges' declaration
is new evidence because "Defendants also failed to discover
Bridges' testimony prior to the Court's summary judgment order."
(Doc. 145 at 8.)

Freedom House responds that the declarations are not newly
discovered because Webb identified Jay and Harris in his initial
discovery disclosures at the outset of the lawsuit pursuant to
Federal Rule of Civil Procedure 26(a)(1). (Doc. 143 at 9.)
Freedom House further notes that Harris' declaration acknowledges
that she approached Webb's counsel well before the court's summary
judgment ruling, putting Webb on notice of her potential testimony.
(Id. at 10 (citing Doc. 133-5 ¶ 36).) In addition, Freedom House
notes, Webb stated in his March 2022 deposition that Jay was "more
than willing to testify." (Doc. 143 at 9.) Further, Freedom House
points out that Jay's declaration fails to state when in December
2022 he spoke to Plaintiff's counsel. (Doc. 143 at 9.) With
respect to Bridges' declaration, Freedom House argues that there
is no evidence as to when Bridges contacted or was contacted by

29

Webb and, therefore, his declaration cannot support a finding it was newly discovered. (Doc. 143 at 11.) In short, Freedom House maintains that none of the declarations warrants reconsideration of the December 20, 2022 Order.

Webb replies that Jay's testimony was discovered in the last week of December 2022 and that it prompted further discussion with Harris, notwithstanding that Harris' declaration states she had previously reached out to Plaintiff's counsel. (Doc. 145 at 6-7.) Webb also re-asserts Jay's and Harris's stated fears of retaliation as bases for finding their testimony newly discovered. (Doc. 145 at 7.)

Webb's contention that the testimony of these witnesses is newly discovered is unpersuasive. Webb knew of Jay and Harris as early as November 21, 2021, seven months before Freedom House moved for partial summary judgment (Doc. 54) and more than a year before Judge Tilley granted partial summary judgment. Further, Webb's characterization of the caselaw is misguided, if not misleading. Weathers did not find that "fears of reprisal" constituted a valid reason for not submitting evidence in that case. Rather, this court merely noted the plaintiff's argument claiming that fears of retaliation should justify consideration of the purported new evidence before declining to find grounds to consider the evidence. Weathers v. Univ. of North Carolina at Chapel Hill, No. 1:12cv1059, 2014 WL 198216, at * 3 (M.D.N.C. 2014). In Maylie, the plaintiff

30

sued his employer pursuant to the Federal Employer's Liability Act
after he slipped and injured his back at work.  <u>Maylie</u>, 1989 WL
153948, at *1.  After the jury found for the defendant, Maylie
moved for a new trial on the ground that an agent of the defendant
used "coercive tactics to discourage employees from testifying."
<u>Id.</u>  The court understandably noted its concern with witnesses'
fears of retaliation if they testified, finding that the employer's
"intimidation and constraint" at the workplace prevented a full
and fair presentation of evidence at trial.  <u>Id.</u> at *2-3.  There
was testimony from employees that a supervisor harassed employees,
carried a gun on his person, and unreasonably refused to allow
employees to return to work.  <u>Id.</u> at *9.  Here, in contrast, Webb
points only to the declarants' self-professed general concerns of
retaliation.  Absent is any evidence or claim that Freedom House
or Daymark threatened, much less fostered an atmosphere of,
intimidation and constraint that prevented either declarant from
voicing her concerns.  Their desire not to become involved in a
lawsuit out of a subjective concern for retaliation, absent
evidence to suggest that a defendant has intimidated or constrained
them, as in <u>Maylie</u>, is insufficient on this record, especially
where Webb's counsel disclosed both of their names as persons with
discoverable information at the outset of the litigation.

     As for Bridges' declaration, Webb does not even attempt to
respond to Freedom House's contention that there is no evidence

Case 1:21-cv-00424-TDS-JLW   Document 159   Filed 05/02/23   Page 31 of 55

that Webb could not have spoken to Bridges during the discovery period. (See Doc. 145 at 8.) The court, therefore, finds that Webb fails to meet his burden to show that Bridges's declaration constitutes newly discovered evidence, either.[7]

As to Jay and Harris, it is also important that neither ever supervised Webb, and thus they lack personal knowledge to assess his work record. See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000) (noting that the opinions of employees and co-workers as to an employee's work quality are "close to irrelevant" in questions of pretext). As for Bridges, he admits that he worked with Webb in 2017 and left Freedom House in 2018. (Doc. 133-2 ¶¶ 1, 13.) Though he states that Webb received positive reviews while they worked together (id. ¶¶ 13-15), the court has already found that merely because Webb previously met expectations does not mean that his employer's later determination that he fell below expectations is nefarious (Doc. 116 at 30-31 (citing Hill v. Belk Stores, No. 3:06-CV-398, 2009 WL 2426314, at *4 (W.D.N.C. Aug. 5, 2009))).

Second, Webb relies on what he claims is newly discovered court filings of alleged previous civil violations by Freedom House

---

[7] Webb's assertion that Bridges's declaration constitutes new evidence because the Defendant "also failed to discover Bridges'[s] testimony prior to the Court's summary judgment order" (Doc. 145 at 8) is meritless. Whether Defendants knew of Bridges is irrelevant to whether Webb should have known of him and obtained his testimony.

and Daymark. (Doc. 137 at 6-7; Docs. 133-7, 133-8, 133-9, 133-10.) It is newly discovered, he argues, because he requested it during discovery but it was not produced by Defendants. (Doc. 137 at 16 (citing Schultz v. Butcher, 24 F.3d 626, 630-31 (4th Cir. 1994)).) Webb points to his request for production of documents number 15, which reads as follows:

> Produce copies of all correspondence and other documents sent to or received from the U.S. Department of Labor, N.C. Department of Labor, or any other governmental bodies, concerning any investigation of Defendant related to Plaintiff's claims.

(Doc. 37-4 at 29.) Freedom House responded, "Defendant will produce documents responsive to this request." (Id.) Webb contends that "neither defendant produced any documents in response to the same." (Doc. 137 at 19.)[8] Webb now argues that "Previous investigations and lawsuits involving Defendants' past pay and FMLA practices are unquestionably related to Plaintiff's claims" whether or not they involve Webb. (Doc. 145 at 13 (citing Hawkins v. Hennepin Tech. Ctr., 900 F.2d 153, 155-56 (8th Cir. 1990)).) Webb bolsters his contention by arguing that it was Harris' new declaration testimony that "alerted Plaintiff's counsel of prior litigation against Defendants." (Doc. 137 at

---

[8] Freedom House contests this, stating that it "ultimately produced responsive documents to this request, including documents contained within the NCDOL's file pertaining to [Webb's] administrative REDA Complaint." (Doc. 143 at 6.) Whatever may have been produced is not in the record. The docket does not reflect that Webb ever moved to compel a response.

33

14.) He claims he thereafter acted with "due diligence" to obtain the evidence. (Id. at 14-16.) Apparently, he requested the information from the United States and North Carolina Departments of Labor but did not receive responses until after the court had advised on its ruling on summary judgment. (Id. at 19; see Docs. 137-1, 137-2.)

Freedom House responds that Webb's requests for production only sought investigations related to "Plaintiff's claims." (Doc. 143 at 5.) Thus, because previous litigation involved other employees, it was outside the scope of the request. (Id.) Additionally, Freedom House argues that Webb knew of these prior lawsuits against it, because Webb referred to them in his deposition in this case and discussed his involvement in one of the lawsuits. (Id. at 5.) Further, Freedom House points out, in response to another of Webb's discovery requests about the effects of previous litigation on Freedom House's internal policies and practices, it listed Joyce Harper as a company representative familiar with that topic; however, Webb declined to question Harper about any prior lawsuits or investigations during her deposition. (Doc. 143 at 5-6 (citing Doc. 44-4).) Freedom House also points out that Harris' declaration only mentions a prior Department of Labor investigation against Freedom House (id. at 6 (citing Doc. 133-5 ¶ 33)) and that, in any event, all court records were publicly accessible at any time (id. at 5-7 (citing Doc. 133-10)).

34

Webb replies that while he testified about one lawsuit that originated "over 15 years ago," he did not testify about other complaints he now submits; therefore, he did not know about these other lawsuits. (Doc. 145 at 14; Doc. 145 n.12.) Further, he contends, he did not need to seek documents from the various departments requesting previous litigation information because he relied on Defendants' "certified responses." (Doc. 145 at 14.) In other words, Webb argues, Freedom House's failure to produce the documents rendered them not previously available to him such that they should be considered newly discovered. (Doc. 145 at 14 (citing Knox Energy, LLC v. Gasco Drilling, Inc., 258 F. Supp. 3d 709, 732 (W.D. Va. 2017); Schultz v. Butcher, 24 F.3d 626, 630-31 (4th Cir. 1994)).) As to Harper, Webb surmises that she would lack personal knowledge of prior lawsuits or investigations because she worked for Freedom House after they took place. (Doc. 145 at 15.)

Webb's arguments are wholly unpersuasive. The prior litigation does not constitute newly discovered evidence. Webb was aware of prior litigation, as he concedes in his deposition. (Doc. 145 n.12 (citing Doc. 143-2).) Moreover, his request for production of documents does not encompass what he now seeks to offer, as the litigation and investigations he seeks to offer do not relate to "Plaintiff's claims" but to claims of others. (Doc. 37-4.) The lawsuits, moreover, were publicly available. Webb

35

could have located those documents at any time. As for the
investigations, Plaintiff's counsel did not send its Freedom of
Information Act requests to the Department of Labor until December
5, 2022 (Docs. 137-1, 137-2), which was well after Freedom House's
motion for partial summary judgment had been submitted to the court
and days after Judge Tilley had orally informed the parties of his
decision on the summary judgment motions (Doc. 96 (noting that
Webb's summary judgment would be denied in full and Freedom House's
would be granted in part).) While it is unclear when Harris spoke
with Plaintiff's counsel about prior litigation, Harris'
declaration was signed on January 23, 2023, well after discovery
closed. (Doc. 133-5 at 13.) In short, the only reason Webb failed
to have this information earlier is his lack of due diligence.
Thus, the court records and investigations involving individuals
other than Webb are not newly discovered.[9]

As the court finds that Webb has failed to demonstrate that
he has newly discovered evidence that would alter the outcome of
Judge Tilley's ruling, the court finds that he has failed to meet
his burden of establishing grounds to reconsider the court's
December 20, 2022 grant of partial summary judgment to Freedom
House, and his motion to reconsider will be denied.

---

[9] Even were the court to consider the declarations and litigation history,
they would not alter the court's partial summary judgment decision for
the reasons explained in the court's analysis of Daymark's motion for
summary judgment.

**B. Daymark's Motion for Partial Summary Judgment**

The court turns next to Daymark's motion for partial summary judgment on Webb's claims for retaliation pursuant to the FSLA and the FMLA.[10] (Doc. 130 at 1.) Because the court re-opened the period for filing this motion, the new evidence submitted by Webb that the court did not consider on his motion for reconsideration can be considered. As discussed below, the court will grant Daymark's motion for summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Developers, Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail

---

[10] Unlike his claims against Freedom House, Webb did not assert a REDA or public policy claim against Daymark.

Case 1:21-cv-00424-TDS-JLW   Document 159   Filed 05/02/23   Page 37 of 55

under any circumstances." _Guessford v. Pa. Nat'l Mut. Cas. Ins. Co._, 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting _Campbell v. Hewitt, Coleman & Assocs., Inc._, 21 F.3d 52, 55 (4th Cir. 1994)).

While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. _Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp._, 475 U.S. 574, 586–87 (1986); _Bouchat v. Baltimore Ravens Football Club, Inc._, 346 F.3d 514, 521 (4th Cir. 2003). A mere scintilla of evidence is insufficient to avoid summary judgment. _Anderson_, 477 U.S. at 252; _Dash v. Mayweather_, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); _see also_ _Felty v. Graves-Humphreys Co._, 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial" (citation omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. _Anderson_, 477 U.S. at 248–49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence

38

to the dispositive question." Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

The FLSA and FMLA prohibit an employer from discharging or otherwise discriminating against an employee because the employee opposes an unlawful practice under the FLSA or FMLA. 29 U.S.C. § 215(a)(3) (FLSA); 29 U.S.C. § 2615(a)(2) (FMLA); see also Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008) (quoting Mitchell v. Robert de Mario Jewelry, Inc., 361 U.S. 288, 292 (1960)) ("The provision therefore effectuates enforcement of the [FLSA's] substantive provisions by removing 'fear of economic retaliation' so that employees need not 'quietly . . . accept substandard conditions.'").

Webb relies on the burden-shifting approach to establish his FLSA and FMLA retaliation claims. See Waag v. Sotera Defense Solutions, Inc., 857 F.3d 179, 191-92 (4th Cir. 2017) (noting the elements for a prima facie retaliation claim under the FMLA are that the plaintiff engaged in protected activity, the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity). This mirrors the burden shifting framework for Title VII cases as set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. (applying the McDonnell Douglas framework in FMLA case) (citing Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 304 (4th Cir. 2016) (same))). Accordingly, he must show that he suffered

39

an adverse employment action that is causally connected to protected activity, and, if Daymark offers a non-discriminatory explanation for the adverse employment action, that Daymark's reasons are pretextual. See Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008) (FSLA claim); Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (FMLA claim).

Webb simply argues that there must be a "causal connection" between a plaintiff's complaints and retaliatory action.[11] (Doc. 133 at 23.) While termination is clearly an adverse employment action, for a retaliation claim the court also considers any employer action that could reasonably be viewed by the employee to discourage protected activity. Strothers v. City of Laurel,

---

[11] The Supreme Court held that for Title VII employment retaliation claims a plaintiff must show retaliatory animus was a but-for cause of the adverse employment action. University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 339 (2013). In evaluating Nassar against the existing McDonnell Douglas framework, the Fourth Circuit has noted that, "A plaintiff who establishes a prima facie case of retaliation bears the 'ultimate burden of persuading the court that [he] has been the victim of intentional [retaliation]." Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 252 (4th Cir. 2015) (citations omitted). To carry this burden, "a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" Id. (citations omitted). Further, the Fourth Circuit held that "the McDonnell Douglas framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action. Nassar does not alter th[at] legal standard." Id. In Foster, the court reaffirmed that a prima facie case for retaliation requires a plaintiff to show that "he engaged in protected activity, that [the employer] took adverse action against him, and that a causal relationship existed between the protected activity and the adverse employment activity." Id. at 253 (citations omitted). The Fourth Circuit has applied this standard in termination and retaliation contexts such as "hiring, granting leave, promoting, compensating, or discharging." Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981); see Foster, 787 F.3d at 253.

Case 1:21-cv-00424-TDS-JLW   Document 159   Filed 05/02/23   Page 40 of 55

Maryland, 895 F.3d 317, 327 (4th Cir. 2018) (noting in Title VII context that "retaliatory actions do have to be 'materially adverse' – such that they 'might have dissuaded a reasonable worker' from engaging in protected activity") (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006))).

An employer's proffered explanation is pretextual when it "is unworthy of credence to the extent that it . . . permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 723 (4th Cir. 2002). For example, "a factfinder may infer that an employer's post-hoc rationale is not a legitimate explanation for an adverse employment decision." Smith v. CSRA, 12 F.4th 396, 421 (4th Cir. 2021) (citing EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001)). Similarly, a factfinder may find pretext when there are inconsistent justifications and a "total lack of documentary evidence" of poor performance. Jacobs v. N.C. Admin. Office of Cts., 780 F.3d 562, 575 (4th Cir. 2015). See also Haynes v. Waste Connections, Inc., 922 F.3d 219, 225-26 (4th Cir. 2019) (recognizing that "an employer is certainly permitted to expand on its original reason for a termination" but evidence of "substantial changes" "permits an inference of pretext"); Sears Roebuck & Co., 243 F.3d at 852-53 (finding that the employer's offer of "different justifications at different times for" the adverse employment action "is, in and of itself, probative of pretext"). On the other

41

hand, a "plaintiff cannot seek to expose [a non-discriminatory] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Holland v. Washington Homes, Inc., 487 F.3d 208, 216 (4th Cir. 2007) (noting that "[t]he former would not create a 'genuine' dispute, and the latter would fail to be 'material'").

Daymark contends that Webb cannot show causation between his alleged wage complaints and his termination because of the lengthy lapse of time between his complaints and his termination. (Doc. 131 at 9-10 (citations omitted).) Further, Daymark argues, Webb failed to show that the decisionmakers involved in his termination knew of his wage complaints. (Id. at 10.) Even if Webb could make out a prima facie case for retaliation, Daymark contends, he fails at the pretext stage. Daymark contends that Webb "must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." (Doc. 131 at 11 (citing Fry v. Rand Constr. Corp., 964 F.3d 239, 246 (4th Cir. 2020) (citations omitted)).) "And establishing that retaliation was the real reason is functionally equivalent to showing that [Webb] would have not been terminated but for [his] employer's retaliatory animus." (Id.) The court already found, it argues, that "Webb was continuously notified of his performance issues as early as . . . 2019" and Webb's termination was not

42

"post-hoc." (Id. at 10-11 (citing Doc. 116 at 31).) For the same reasons Webb's retaliation claims fail against Freedom House, Daymark argues, his retaliation claims against it similarly fail. (Id. at 13-14.)

Webb's contentions fail. It is doubtful Webb meets his prima facie case burden. In his current motion he raises many of his arguments from his initial motion for summary judgment; namely, that he began making wage complaints to Daymark as early as January 2019. (Doc. 133 at 11 (citing Doc. 53-2 at 121-22).) After he made inquiries in early 2019, he contends, Daymark began taking adverse actions against him, including telling him that he was not complying with his job description. (Id. at 12-13.) By October 2019, Webb maintains he began suffering "disparate treatment" because of his wage complaints. (Id. at 15.) He claims he was disciplined multiple times and was singled out, with this disparate treatment culminating in his May 2020 termination. (Id. at 15-19.) As to Daymark, he argues that his claims are "separate and district [sic] from his claims against Freedom House." (Id. at 20.)

Webb's failure to complain about his pay from March 2019 until January 2020 belies his argument that his October 17, 2019 write-up was retaliatory, as nearly six months elapsed since his last alleged complaint. (Doc. 53-2 at 130.) See King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting in the Title VII context

43

that plaintiff's firing two months and two weeks after his receipt of the EEO complaint was "sufficiently long so as to weaken significantly the inference of causation between the two events"); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) ("A lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse action negates any inference that a causal connection exists between the two.") (citation and some alterations omitted)); Hamada v. Boeing Co., Civ. A. No. 2:19-02777-DCN-MGB2021 WL 4596598, * 10 (D.S.C. Apr. 23, 2021) (noting in the FMLA context that "temporal proximity alone may support a reasonable inference of retaliatory causation if the relationship is "very close" but that two months is 'sufficiently long so as to weaken significantly the inference of causation'"), report and recommendation adopted by, 2021 WL 4398456 (D.S.C. Sept. 27, 2021) (noting that "a court may find causation when one or two months have passed between the protected activity and the retaliatory act, but 'only where there are additional facts to establish the causal connection'") (citations omitted)). See also Sowers v. Bassett Furniture Industries, Inc., Civ. A. No. 4:19cv00039, 2021 WL 276169, *4 (W.D. Va. Jan. 27, 2021) (noting that a period of approximately 10 to 11 months between the protected activity and the adverse employment action cuts against finding any causal connection between the two events in the FMLA context). Cf. Hines

44

v. Blue Cross & Blue Shield of N. Carolina, No. 1:19-cv-754, 2020
WL 3452155, at *4 (M.D.N.C. June 24, 2020) (finding, in the FMLA
retaliation context, the court has previously held that a plaintiff
satisfies the third element of a retaliation claim by alleging a
gap of approximately two months)).

Even if Webb could meet his prima facie case, Daymark has
proffered extensive non-discriminatory reasons for its discipline
resulting in his discharge – namely, Webb's continuing poor
performance problems detailed extensively by Freedom House and
Daymark. As the court previously found as to Freedom House's
motion for partial summary judgment (Doc. 116 at 22-32), Webb was
continuously notified of his performance issues as early as June
2019 (Doc. 116 at 31). Indeed, he was admonished, repeatedly,
about his performance deficiencies, including poor communication,
attitude problems, late work, failure to perform required
assessments, evasion of calls, and more. For example, his June
probationary evaluation noted that Webb "needs improvement" on
documentation. (Doc. 53-4 at 2-4; see Doc. 57-13 at 1.) On
October 17, 2019, Burkert wrote that she spoke with Webb after
hearing complaints from others about Webb's "attitude" and
frustration with him. (Doc. 56-9.) Webb admits that he spoke
with Anthony-Byng "concerning [Webb] talking to one of the ladies
at the call center" and "signing a piece of paper," but denies
signing the October 2019 Employee Disciplinary Action Form. (Doc.

45

41-6 at 68-70.)  The October 17, 2019 Employee Disciplinary Action Form outlined the "ongoing issues with . . . dispatch; having attitude with dispatch operators, [including] asking who else is available to take calls, complaining about the distance, [etc.]."[12] (Doc. 53-23 at 3.)  The October 17 form also states that Webb did not return phone calls, texts, and emails to the team lead and work was being sent late, which made other clinician's work untimely.  (Id.)  These problems continued through spring of 2020, as outlined above in detail.

Yet Webb argues that because "Daymark's purported reason for the termination is far narrower than Freedom House's," Daymark's reasons for terminating Webb "were certainly pretextual."  (Doc. 133 at 21.)  To support this contention, Webb cites to the declarations and litigation history discussed in connection with his motion for reconsideration.  (Docs. 133-2, 133-3, 133-5, 133-7, 133-8, 133-9, 133-10.)  But Daymark's reasons were largely, if not fully, based on Freedom House's supervision problems with Webb, which this court has already found to be adequate to support his discipline.

Webb continues to maintain that, contrary to Daymark's arguments, his performance was more than adequate; for instance, his "June [2019] probationary evaluation affirmed [he] was 'very

_____

[12] This is one of the forms that Webb acknowledges bears his signature but he contends he did not sign.  (See Doc. 53-2 at 148.)

46

pleasant and easy to communicate with and got along well with the dispatchers[.]'" (Doc. 153 at 15 (citing Doc. 53-4 at 15.) And according to Webb, it was only after his wage complaints that he began receiving disparate treatment. (See Doc. 133 at 15 (citing Doc. 53-4 at 4).) His references to his positive job performance reviews, however, is selective. Even though his June performance had positive notations, the fact that he had positive reviews prior to his new position in 2019, as this court previously noted, does not establish that his employer's complaints about his performance was pretextual. (Doc. 116 at 30-31 (citing Hill v. Belk Stores Servs., Inc., No. 3:06-CV-398, 209 WL 2426315, at *4 (W.D.N.C. Aug. 5, 2009).)

Further, Webb argues that he was being written up for things not in his job description. For instance, he contends that "[n]owhere in the job description[]" was he required to "return calls immediately[]"; rather, he claims, he was "instructed to return calls to management twice per day." (Doc. 133 at 15.) However, to support his argument he cites to a 2016 addendum to his offer letter for his previous part-time position rather than to his December 2018 offer letter. (Doc. 133 at 15 (citing Doc. 53-10); see Doc. 53-20.) Accordingly, his reliance on the 2016 offer letter is clearly misplaced. And while in his deposition he testified that he had only one conversation about returning emails, calls, or texts during his employment, and it was about the email

47

system being down once (Doc. 53-2 at 145-46), he does admit that
in one of his disciplinary action forms he was "instructed to
return all phone calls, texts, and emails to the team lead, program
director, and dispatch within 24 hours" even though he states he
has no recollection either seeing or signing the form. (Id. at
147-50.)[13] He also admits he was notified as early as October 2019
of the need to improve his communication (Doc. 53-2 at 146-50);
his January 2020 disciplinary action form noted the requirement
that he return "ALL phone calls, texts and emails to Team Lead
and/or Program Director within 24 hours" (Doc. 53-23 at 6-7); and,
he was reminded again about communication issues on April 2, 2020
(Doc. 53-27). His January 2020 disciplinary form similarly noted
his failure to respond to all email communications (as noted in
the October 17, 2019 form), lack of holding clinical supervision
meetings, and his poor productivity standards. (Doc. 53-23 at 6-
7.) In an effort to distance himself from the disciplinary forms,
Webb contends, in contradictory fashion, that he never saw the
forms until briefly before his deposition (Doc. 53-2 at 148) but
that the January write-up was retaliation for his having complained
about his pay (even though the only record evidence is that in

---

[13] Webb states in his memorandum that he was the only one who engaged in
protected activities and who was disciplined. (Doc. 133 at 15-16.)
However, he again cites to inadmissible hearsay to support these
contentions, including Haynie and Jay's declarations. Further, while
Webb surmises that "Daymark was determined to terminate [him] for his
repeated wage complaints," his only citation is to previous Department
of Labor investigations of Defendants concerning different employees.

48

January/February 2020 he requested copies of his timesheets (Doc. 133 at 18)). Disciplinary form aside, Shoaf notes many of these issues set out in the January 2020 write-up, such as poor communication, in her recommendation for termination in May. (Doc. 41-11 at 2-3.)

Webb further claims that Daymark's role in his termination supports his retaliation claim. (Doc. 133 at 27.) He notes that Williams (of Freedom House) recommended that he be placed on a performance improvement plan before termination but that Daymark decided to terminate him instead. (Doc. 133 at 29 (citing Doc. 57-10 (showing that Williams suggested a "90-day Performance Improvement" to Burkert and Griffin-Dolciney)).) But this email came on May 8, 2020, and was sent only to other Freedom House employees – Burkert and Griffin-Dolciney. (Doc. 57-10 at 1.) On May 20, 2020, Williams forwarded to Shoaf (of Daymark) emails from Burkert (of Freedom House) outlining Webb's performance issues and Burkert's opinion that he "is not competent to be in this position" and that "financially, he is not even coming close to covering his own salary." (Doc. 53-29 at 3.) Importantly, Williams' email to Shoaf came <u>after</u> Burkert had already highlighted reasons she believed Webb needed "immediate removal from MET, as [Burkert] no longer [felt] capable of supervising him without significant risk of jeopardizing [her] own license." (<u>Id.</u>)

Similarly, Webb points to the fact that Shoaf had to approve

49

his termination (Doc. 133 at 30 (citing Doc. 44-6 at 146; Doc. 44-5 at 45)), and he argues that she "knew of [his] need for protected leave and thereafter conspired to retroactively generate pretextual reasons for termination" (Doc. 133 at 31). There is no basis in the record for this contention. Webb never asked for FMLA leave, and no one at Daymark ever discussed it. (See Doc. 44-6 at 123-24; see also Doc. 53-2 at 116-118.) Indeed, the record appears silent on any consideration of Webb's FMLA rights throughout his tenure. (See also Doc. 116 (finding the same).)

Webb argues that Shoaf was "lobbying to terminate [him]" and "acknowledged the lack of written documentation surrounding the alleged performance issues" in Shoaf's May 26, 2020 email. (Doc. 133 at 29 (citing Doc. 41-11).) In the email, however, Shoaf told Miller (Freedom House's CEO) and Sumpter (a Freedom House consultant) that she "agree[d] with [the] termination recommendation," which appears to have initially come from Burkert or Williams of Freedom House, and, in the alternative, said "if we do not terminate; [sic] then, employee would be put on final corrective action with [a] very specific plan of improvement and understanding that if [the] plan is violated at any time it would lead to termination." (Doc. 41-11 at 3; Doc. 41-5 at 50.) Shoaf stated her concern that the "potential liability for client care outweighs risk to [the] agency" and recommended "as a consultant, to proceed . . . with terminating Mr. Webb." (Doc. 41-11 at 3;

Doc. 41-5 at 64; see Doc. 55 ¶ 61.)  Further, Shoaf wrote that Webb was on administrative leave, that "we need to make a decision quickly," and that Miller or Sumpter should let her or Williams know if any other information was needed.  (Doc. 41-11 at 3.) Miller responded that he spoke with Sumpter and that they agreed on termination because of the "potential liability to client care and the agency."  (Id. at 2.)  Shoaf then directed Williams to inform Griffin-Dolciney and Burkert to move forward with termination and explain the reasons supporting termination.  (Id.)

Webb represents that "Shoaf admitted to knowing about [Webb]'s wage complaints (through Williams), and her recollection on the timing of when she heard about the complaints was far from clear."  (Doc. 133 at 23 (citing Doc. 41-5 at 90-91).)  Webb cites this as a genuine dispute of material fact about whether Daymark knew he engaged in alleged "protected activity" during January and February 2020.  (Doc. 133 at 23.)  This is a misrepresentation of the record.  In fact, Shoaf testified that while she did not know the specific date Williams informed her of Webb's pay complaints, "it would have been after Freedom House had . . . terminated Mr. Webb," adding, "at no time was I involved in anything dealing with his pay and wages."  (Doc. 41-5 at 91-92 (emphasis added).)  Webb offers no evidence to the contrary.

True, Shoaf notes that she discussed Webb's performance with Anthony-Byng (Doc. 41-11), though the latter had left her role as

51

Daymark's Director of the Mobile Crisis Division in February 2020,
three months prior to Webb's termination (Doc. 63-2 ¶ 3). Webb
argues that after conferring with Anthony-Byng, "Shoaf
acknowledge[d] there was an insufficient basis to terminate [him],
but nonetheless, Webb needed to be terminated anyway and
*documentation issues* would be the pretext used." (Doc. 133 at 18-
19, 21 (citing Doc. 41-11).) This contention also finds no support
in the record. Shoaf wrote that although she is concerned because
of Webb's "tenure, race, age and [the] fact that employee's
documentation issue has not been addressed in writing," she
nevertheless believed that the "potential liability for client
care outweighs the risk to agency." (Doc. 41-11 at 3.) Shoaf
further noted that "[t]he recommendation of the direct supervisor
and Regional Director is termination" and that "[t]his can be
<u>supported</u> by agency procedure as it does not require specific
disciplinary processes." (<u>Id.</u> (emphasis added).) Moreover, Shoaf
wrote, "[Webb] was written up in October and again in January for
basically not following through with appointments, responding to
supervisor [sic], returning calls[,] etc." (Doc. 41-11 at 2.)
She found that "[Webb] continues to have issues and since April
has failed to do assessments on approximately 20 clients . . . ."
(<u>Id.</u>) While she did note that "[d]ocumentation was not a main
issue addressed in these write ups," (<u>id.</u>), it does not show that
her recommendation to fire him was pretextual merely because Webb

52

had not previously been written-up on one specific issue when a litany of other problems, about which Webb had been notified repeatedly, were present. The record is devoid of any indication that Anthony-Byng informed Shoaf about any alleged wage complaints (see Doc. 41-11 (noting several deficiencies in Webb's employment performance but not discussing any wage concerns)); indeed, by this time, Webb's discussion with Anthony-Byng about his wages and timesheets was more than a year old.

For the reasons noted previously by Judge Tilley in granting Freedom House's motion for partial summary judgment, Webb's self-serving testimony and that of his co-workers does not create a dispute of material fact. (Doc. 116 at 31-32.) The new declarations similarly do not fill the void. As noted, Bridges no longer supervised Webb when Webb's employment troubles began. (Doc. 133-2 ¶¶ 1, 13.) Similarly, neither Jay nor Harris supervised Webb, so their comments as to his job performance cannot support a claim of pretext. See Hawkins, 203 F.3d at 280 (noting co-workers' opinions of an employee's work quality are "close to irrelevant" in questions of pretext). As to each of the newly offered declarations, moreover, Webb relies on inadmissible hearsay about what each declarant claims Webb was told by Freedom House and Daymark, when none of them has any personal knowledge of those discussions.

Finally, none of the prior litigation history submitted by

53

Webb (Docs. 133-7, 133-8, 133-9, 133-10) suffices, alone or in combination with the other record evidence, to support a jury conclusion that Daymark retaliated against Webb in connection with his employment.[14] The analysis of the court's prior summary judgment ruling applies equally here. (See Doc. 116 at 21 to 36.) As this court's December 20, 2022 decision found, even if Webb could show a prima facie case of retaliation, he has not shown sufficient evidence from which a reasonable jury could find pretext. (Doc. 116 at 30.) He was continuously notified of performance issues, even during periods in which he admits he did not complain about his wages, and his performance was assessed by Daymark and Freedom House to jeopardize professional licenses. (Id. at 30-31.) While Webb may disagree with the characterizations of his performance, this disagreement "does not prove that [the decision] to fire Webb for continued poor performance placing the agency and its clients at risk was 'dishonest or not the real reason for his termination.'" (Doc. 116 at 31-32 (quoting Laing v. Fed. Express Corp., 703 F.3d 713, 722 (4th Cir. 2013)) ("[I]n attempting to defend the conduct that led to her termination, all Laing has proven is the unexceptional fact that she disagrees with the outcome of FedEx's investigation.").) It is the perception

---

[14] Webb proffers only one Department of Labor investigation, which was a "self-audit" after which the department recommended that the file be closed with no penalty assessed. (Doc. 133-10 at 5, 7.)

of the decision maker which is relevant, not "the self-assessment of the plaintiff." (Id. (citing Hawkins v. PepsiCo., Inc., 203 F.3d 274, 280 (4th Cir. 2000)).)

In sum, none of the additional evidence provided by Webb creates a genuine dispute of material fact. Therefore, Daymark's motion for partial summary judgment as to Webb's retaliation claims will be granted.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Webb's "Emergency AMENDED Motion for Reconsideration" (Doc. 136) is DENIED;

IT IS FURTHER ORDERED that Defendant Daymark's Motion for Partial Summary Judgment (Doc. 130) is GRANTED and Webb's claims against Daymark of FMLA retaliation (Count 4) and FLSA retaliation (Count 5) are DISMISSED.


                                        /s/   Thomas D. Schroeder
                                  United States District Judge

May 2, 2023

55